Filed 4/9/14  P. v. Casica CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F063191 |
| Plaintiff and Respondent, | (Super. Ct. Nos. BF131978A & BF131978B) |
| v. | |
| ADOLF T. CASICA et al., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Adolf T. Casica.

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant Pablo Salas.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendants Adolf T. Casica and Pablo Salas were jointly charged with: conspiracy to commit murder (Pen. Code,[1] § 182, subd. (a)(1)); special circumstances murder committed in the commission of a robbery (§§ 187, subd. (a), 190.2, subd. (a)(17)(A)) in furtherance of a street gang (§ 190.2, subd. (a)(22)), and with premeditation (§ 189); robbery (§ 212.5, subd. (a)); possession of a firearm by a felon (former § 12021, subd. (a)(1), now § 29800, subd. (a)(1)); and active participation in a criminal street gang (§ 186.22, subd. (a); hereafter § 186.22(a) or gang participation offense). In addition, defendants were charged with committing the above offenses for the benefit of a criminal street gang (§ 186.22, subd. (b); hereafter gang enhancement), and using a firearm to commit the murder and robbery (former § 12022.53, subds. (d) & (e)(1)). A jury acquitted both defendants of the conspiracy charge and convicted Casica of the remaining charges and enhancements. Salas was acquitted of the felon in possession charge and the jury found, as to him only, the murder was not premeditated. He was convicted of the remaining charges and enhancements. The trial court subsequently sentenced both defendants to life without the possibility of parole plus 25 years to life.

On appeal defendants jointly contend: (1) the evidence was insufficient to support the gang participation offense and the gang-murder special circumstance; (2) the prosecutor improperly excused a juror on the basis of race in violation of *Batson/Wheeler*;[2] (3) the prosecution violated discovery orders; (4) the trial court erred in admitting gang related exhibits; and (5) the trial court erred in imposing a parole revocation fine. Salas further contends the trial court erred in denying his motion to sever his case from Casica; Casica claims an error in his abstract must be amended. We conclude the evidence was insufficient to support the gang participation offense as to

---

[1] All further references are to the Penal Code unless otherwise indicated.

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 165-173.

2.

both defendants and the parole revocation fine was improperly imposed as to both defendants. We reject defendants' remaining claims.

## FACTS

On April 26, 2010, the victim, Amber Kelch, invited Casica over to her house by text message, noting her live-in boyfriend would be leaving for work that evening and would be gone for four days. Casica responded he was bringing his "homie" with him. During the evening hours, Casica and Salas arrived at the victim's home in Bakersfield. The victim's teenage son Tim recalled two men coming over to the house that evening, and he allowed them inside while the victim was in the shower. Tim then went to his room and fell asleep while listening to music through headphones. He fell asleep sometime after 11:00 p.m. and did not wake during the night. Although he did not know the men at the time, Tim subsequently identified Casica in photographic lineups. Tim recalled his father, Michael Shawn Lovett, had two AR-15 style rifles at the time, which he often took to work with him.

Around midnight, Gilfred Cachola, the victim's drug dealer, delivered approximately $40 worth of methamphetamine to the victim at her home. When he dropped off the drugs he noticed two men at the victim's house. Subsequently, Michael Zimmerman began exchanging text messages with Salas, whom he knew as Sikes, regarding providing Salas with a ride. Zimmerman ultimately received directions to pick up Salas near the victim's home. Salas stated he wanted to "reup," which meant to get more drugs. Zimmerman drove Salas around town for about an hour and then dropped him off where he originally had picked him up.

Between 4:00 a.m. and 5:00 a.m. a woman Kassie Thompson knew as Dreamer asked her for a ride to pick up two men. Dreamer was very nervous at the time. Thompson drove Dreamer to the victim's house in her truck as directed by Dreamer, who was on the phone with someone providing directions. When they arrived at the victim's house, Casica and Salas emerged and put a rifle case in the back of the truck. The men also had a backpack. Defendants got into the truck and Thompson drove them back to

3.

her apartment where they removed the rifle case and backpack from the truck and parted ways. Salas told Thompson he was going to sell a PlayStation3 and give her money for gas for picking them up.

A few days later Casica, whom Thompson only knew by his moniker, Monster,[3] showed her a picture of himself holding a rifle with another rifle visible in the background. He told her he had sold the guns for $780 although he had wanted $1,000 for them. Thompson also saw Casica with a handgun a few days after the murder.

Angela Aguilar, who goes by the name Dreamer, is Casica's girlfriend and the mother of one of Casica's children. Aguilar knows Casica is known as Monster. She testified she never asked Thompson for a ride or went with Thompson to pick up Casica and Salas. During the relevant time period, Aguilar lived with Marene Grimaldo, Salas's sister. There were times when both Salas and Casica would be at her apartment visiting, but the two never really talked to each other.

Sometime before 10:00 a.m., the victim's son woke up and went to check on his mother since she did not wake him for school. He found her lying face down on her bed. He went to a neighbor's house for help and also called his father.

Bakersfield police officer Brian Looney responded to the victim's home and found her lying face down on the bed, deceased. The victim died from a single gunshot wound to the head that entered above her left ear. There were a number of papers on a tray on the bed, next to the victim's leg. Detective Michael Hale inspected the home after the murder and noted one of the papers found next to the victim had the words "Mr. Monster," a symbol known as a "kanpol," and the words "SSBKS" and "Southgate Lokos." Casica's fingerprints were on this paper.

In addition, Hale found baggies of methamphetamine in a case on the nightstand and noted the victim had a methamphetamine pipe in one hand and a lighter in the other.

---

[3]Casica requests this court to take judicial notice of the statement of facts of various unpublished opinions demonstrating other gang members in other jurisdictions also use the moniker "Monster." We deny Casica's request.

4.

There were three blue cups with liquid located on a dresser in the bedroom, and a spent .380 shell casing under the bed. The house did not appear in disarray, and there were no signs of forced entry anywhere in the home. The detective also noticed an ammunition case with numerous .223-caliber rounds of ammunition on the floor in the front room of the house.

Casica's fingerprints were on the papers found next to the victim as well as on one of the blue cups and on the ammunition box. Salas's fingerprints were also on one of the blue cups. The victim's fingerprints were on the third blue cup. No fingerprints were located on the shell casing.

Michael Shawn Lovett was the victim's live-in boyfriend and father of her child. At the time of the homicide he owned two AR-15 rifles. The .223 ammunition was also his and was for the rifles. He worked in an oil field and often left home for five days at a time to work. He left the home between 7:00 and 7:30 p.m. on the night of April 26th to go to work. He kept his two guns in a single rifle case, which he left under the bed, before going to work on the day of the murder. He also owned several PlayStation video game systems. Both rifles, the rifle case, and a PlayStation3 system were missing after the murder. Lovett viewed People's exhibit 12, a photograph of Casica holding a rifle with another visible in the background and noted both guns looked like his. In addition, a rifle case in the photo looked like his missing gun case.

Detective Richard Dossey downloaded information from Casica's cellular telephone after Casica was arrested. People's exhibit 12 was a photograph on that phone, and the electronic information associated with this picture established the photograph was taken on April 27, 2010, at 3:41 p.m. In addition, Detective Dossey noted Casica had an entry in his contacts for a "Pablo" with a phone number associated with Salas. Subsequently, Detective Hale performed a search of a residence at an address Casica frequented. He found numerous items of graffiti at the residence with the markings "Mr. Monster," "SSBKS," "SSL," and "X3." In addition, he found "Bakers" written on a

5.

garbage can under the word "trash."  A search of residences associated with Salas revealed no gang graffiti or indicia.

Grace Barela, Casica's sister, was the victim's best friend.  She had introduced Casica to the victim and took him to the victim's home approximately a week before the murder.  She recalled the victim sometimes talked about her boyfriend's guns.

### Cell Phone Evidence

Jason Furnish, an investigator for the Kern County District Attorney's Office, testified as an expert regarding cellular telephone records.  He analyzed telephone records for both Casica's and Salas's cellular telephones, including telephone calls and text messages.  In addition, he was provided information as to the cellular phone tower used for each telephone call of each phone, and was able, with that information, to determine the general vicinity of the telephones at the times they made or received calls.  Based on this analysis, Furnish determined the records were consistent with Casica's phone being located at the victim's address between 9:00 p.m. on April 26, 2010, and 5:29 a.m. on April 27, 2010.  During that time period there were 60 calls on Casica's phone, and Furnish opined there was little or no movement of the phone.  At 5:55 a.m., however, the telephone had moved to another region within Bakersfield.

Furnish determined Salas's telephone records were consistent with Salas also being at the victim's home from 10:34 p.m. on April 26, 2010, to 3:05 a.m. the next morning.  The telephone moved at some point between 3:05 a.m. and 3:32 a.m. when it began using towers in another area of Bakersfield.  However, the phone returned to the vicinity of the victim's home at 4:14 a.m.  The last record of the phone using a tower that serviced the victim's address was at 5:14 a.m.  The next call was not placed until 9:06 a.m. when the phone was in another area of Bakersfield.

In reviewing the text messages on Salas's phone, Furnish noted they had a signature of "Sikes" on them.  There were several text messages between Salas and Zimmerman just before Salas's telephone began using towers in other areas of Bakersfield.

Between 10:32 p.m. and 11:04 p.m. there were four text messages between Salas and Casica. Initially, Salas sent Casica a message saying "No dome." A few minutes later, he sent another message saying "Tehatch first." Casica replied a few minutes later stating, "I HAVE 2 DOME HER." Twenty minutes later Salas replied, "To much eyes in the naborhood but we can do that unsuspected after." At 2:46 a.m., Salas text messaged Casica saying, "I got a plan." The term "dome" meant to shoot someone in the head.

In several text messages prior to the murder, Casica had stated he was "strapped," meaning he was armed with a firearm. None of those messages had been sent to Salas. On April 20, 2010, Casica sent a text message to an unidentified person stating, "HEY KEEP AN EYE OUT 4 SOME 380 BULLETS 4 ME."

The records were also consistent with Casica having visited the victim's home for several hours on the morning of April 18, 2010.

### Gang Evidence

The parties stipulated the South Side Bakers and the Varrio Bakers were criminal street gangs within the meaning of section 186.22.

Jessica Young, the mother of one of Casica's children, testified Casica is a member of the South Side Bakers and goes by the name Monster. Juan Flores is a longtime friend of Casica. Although Flores admitted previously belonging to the South Side Bakers, he claimed he was no longer active within the gang and stated he did not know if Casica was a member. He claimed he had never heard of the Southgate Lokos and did not know what a kanpol was. Flores had received several letters from Casica after Casica's arrest in this case; the letters were seized by the police during a search of Flores's home. Flores claimed not to know what the contents of the letters meant.

Casica had several tattoos when he was arrested. Among them were the letters "SSBKS" in large letters across his back, the word "Bakers" down his right arm, "South Side" across his chest, and "Monster" on the right side of his chest. At the time of his arrest, Casica was wearing a baseball cap with the Superman logo on it, i.e., a large "S" on a pentagon-shape shield.

7.

Salas had several contacts with law enforcement. In 2002, Salas admitted he was a Varrio Bakers member and had been since the age of 13. He used the moniker "Psycho," which had been used by one of his deceased brothers. In 2007, Salas was contacted with another member of Varrio Bakers, Roberto Hurtado. Both men claimed membership in the Varrio Bakers. That same year, Salas was again contacted and he was wearing dog tags inscribed with the name "Lil Cyco," VBKS, and the number 13. In December of that same year when he was contacted by law enforcement, Salas stated he used to be a Varrio Bakers gang member.

Detective William McNeal was involved in the investigation of the homicide of Cruz Martinez, "Bam Bam," in November of 2010. Martinez was a South Side Baker who was killed by a Varrio Baker over an incident where Martinez had brandished a gun at the Varrio Baker. As a result, a meeting was held between the gangs, and Martinez was ultimately killed by a Varrio Baker. Detective McNeal characterized the two gangs as rivals, but noted that members of the two gangs could associate outside of the gang. Both the Varrio Bakers and South Side Bakers are part of the larger Sureño organization.

Bakersfield police officer Eric Littlefield testified as an expert regarding criminal street gangs. During the course of his duties, he spoke to members of criminal street gangs daily and often discussed their current rivalries. Gangs generally fall along racial lines. There are several Hispanic gangs in the Bakersfield area, including the Varrio Bakers, Colonia Bakers, Loma Bakers, East Side Bakers, West Side Bakers, South Side Bakers, Brown Pride Locos, and Okie Bakers. The majority of these gangs are affiliated with the Sureños, which is subservient to the Mexican Mafia. The number 13 is significant to the gangs that fall under the Sureño ideology and it represents the letter "M," the 13th letter of the alphabet. The letter "M" is important because it stands for the Mexican Mafia, the overall governing body for the Sureños and all other gangs falling under the Sureño ideology. Littlefield explained the Mexican Mafia sets the rules of conduct for all Sureños and the other gangs falling under the Sureño ideology. The number 13, the letter "M," and the color blue are common gang symbols in the Sureño

8.

ideology. Gang members sometimes use the term "sur," meaning south in Spanish, to identify themselves as affiliating with Sureño ideology.

People can become members of a gang by being "jumped in," meaning they are beaten by other members of the gang for a predetermined amount of time. They can also "put in work" for the gang, meaning they engage in criminal acts on behalf of the gang. In gang culture, respect is very important, and disrespect can be dealt with violently. Generally, members are proud of their gang affiliation and will often get tattoos to announce their gang status.

Littlefield was familiar with the Varrio Bakers street gang through his investigations. The Varrio Bakers are rivals with the Okie Bakers and Colonia Bakers, although all are subsets of the larger Sureño organization. As such, members of the gangs would also be members of the Sureño organization. The Varrio Bakers use various signs and symbols, including a kanpol, which is the Mayan or Aztec symbol for the number 13 and consists of three horizontally aligned dots above two parallel horizontal lines.

The Varrio Bakers use the symbols "V," "VB," and "VBKS" to identify their gang. "BKS" is also a common abbreviation used among several Bakersfield gangs that signifies they are from that area. Littlefield identified some photographs of tattoos and graffiti showing members of both the Varrio Bakers and South Side Bakers used symbols such as the kanpol, the number 13, and the word "sur."

Littlefield identified photographs of Salas, one with him wearing a jersey with the number 13, and one showing a tattoo of the word "Bakers" on his abdomen, common symbols of the Sureño organization.

Littlefield reviewed photographs, interview cards, and booking information for Salas. He determined Salas used the moniker Cyco or Lil Cyco, and he had identified himself as either South or Varrio Baker when asked if he had any gang affiliation. Additionally, in March of 2007 Salas was contacted in the company of Roberto Hurtado, "Stranger," and both men admitted membership in the Varrio Bakers. Furthermore,

9.

Littlefield reviewed six offense reports involving Salas. Based upon Salas's tattoos, booking information, self-admission, the other reports reviewed, and a photograph of Salas wearing a "13" jersey, Littlefield opined Salas was an active member of the Varrio Bakers street gang.

The South Side Bakers are another subset of the Sureño organization. Littlefield has had numerous contacts with its members and is familiar with the gang. The Southgate Lokos is a subset of the South Side Bakers. Littlefield identified photographs of South Side Bakers' graffiti and tattoos highlighting the use of the kanpol, the number 13, and the color blue. In addition, he provided a photograph of a man with tattoos relating to both the South Side Bakers and the Southgate Lokos, thus demonstrating the relationship between the gangs.

Littlefield testified the initials SSBKS and SSB referred to the South Side Bakers. The South Side Bakers also use the Superman logo as a symbol of their gang. However, this symbol would not use the color red as red is the color of their rivals, the Norteños. SGL and SGLKS stand for Southgate Lokos.

Littlefield reviewed pictures of Casica's tattoos consisting of "Monster" on the right side of his chest, "South Side" across his chest from shoulder to shoulder, "SSBKS" in large letters across his back, and "Bakers" down his arm. In addition, Littlefield reviewed the paper found next to the victim's body, which had "MR MONSTER," "SSBKS," "SOUTHGATE LOKOS," and a kanpol written on it. This paper had significance within the gang culture as it displayed the gang name, and also because it showed the gang's rivalries with the Norteños and the Okie Baker gang. This was demonstrated by the fact the letters "n" and "o" were crossed out in the writing. People's exhibit 50 represented additional gang writing showing Southgate with the letters "n" and "o" crossed out, and the number 13. Writing graffiti on items can be "putting in work" for the gang.

Littlefield reviewed people's exhibit 12, a picture of Casica wearing a hat with the Superman logo. Significantly, the "S" in the logo is not in its usual red, which is the rival

10.

Norteño color. Casica's "Bakers" tattoo is visible on his exposed arm and he is holding an assault-type rifle with another rifle visible in the background. These firearms are considered very valuable within the gang, and having them gives a person status and respect within the gang.

Littlefield reviewed booking information for Casica, finding he claimed the Sureño and South Side Bakers; in his most recent three bookings he also claimed the subset Southgate Lokos. After reviewing Casica's tattoos and booking information, Littlefield opined Casica was an active member of the South Side Bakers.

Littlefield did not believe the South Side Bakers and Varrio Bakers were rival gangs. Littlefield was aware of the Cruz Martinez murder in 2010. Martinez was killed by Encarnacion Barrientos, a Mexican Mafia member, during a meeting in which members of both the Varrio Bakers and South Side Bakers were present. The killing had to do with disrespect Martinez had shown to Barrientos and disrespect from a South Side Baker toward a Varrio Baker. Significantly, Littlefield did not consider Barrientos a member of the Varrio Bakers, noting he had the word "Shafter" tattooed across his forehead.

After being presented with a hypothetical based upon the facts of this case, Littlefield opined a murder and robbery could benefit both the Varrio Bakers and South Side Bakers street gangs. Crimes of violence, such as homicides, build fear and intimidation within the community that, in turn, benefits the gangs by allowing them to commit crimes with impunity. Committing a murder gives gang members and the gang as a whole respect. The gang becomes more feared and the gang members who commit the crimes earn or gain status within the gang. Furthermore, firearms are extremely valuable within the gang, and the theft of assault-type rifles gives the gang members additional respect. Littlefield opined the two gangs in the hypothetical—the Varrio Bakers and South Side Bakers—would each benefit from the actions because the two gangs were not rivals and the two have an ongoing sense of cooperation. If, however, the

11.

crime would have been committed by rival members, then Littlefield would not find mutual gang purpose in the crimes.

Several letters written by Casica were admitted into evidence. In one letter Casica wrote to his "Southgate Loko & brother" Juan Flores. Casica stated he had "put in so much work, and I'm not going to stop either, you know? I want my hood to be proud of me" and he could not wait to "blast" (tattoo) the initials SSBKS and SGL as well as a kanpol on his face. Casica signed the letter with his "Southgate love, respects & loyaltys" and used his moniker Monster, as well as SSB, SGL, and a kanpol. In another letter to Flores, Casica acknowledged the murder of Martinez stating, "To be honest I didn't care for Bams, but I can't let something like that go unpunished & avenged [*sic*], right?" On the envelope of the letter, there is an "S" inside of an inverted triangle.

## DISCUSSION

### I.      Sufficiency of the Evidence

Both defendants challenge the sufficiency of the evidence against them regarding the active gang participation charge (§ 186.22(a)), as well as the gang-murder special circumstance (§ 190.2, subd. (a)(22)) allegation. Casica argues the evidence was lacking on two points, namely, (1) his knowledge of the criminal purpose of the gang, and (2) his intent to further the gang. As each of these elements are required for both charges, he argues, both convictions must be reversed. Salas joins these arguments, additionally arguing the evidence failed to establish he was an active participant in the gang, thus providing another ground for reversal.

In supplemental briefing we asked the parties to address the effect of our Supreme Court's recent opinion in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*) holding the gang participation offense cannot be committed by a lone gang member. We find that based on the holding in *Rodriguez*, defendants' convictions for the gang participation offense must be reversed.

12.

## A.    Legal Standards

When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed.  [Citation.]  We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof."  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.)  Further, we review "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  "It is the jury, not the appellate court, that must be convinced beyond a reasonable doubt."  (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

## B.    Gang Participation Offense

Section 186.22(a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished …."

Recently in *Rodriguez*, *supra*, 55 Cal.4th 1125, in a plurality opinion, our Supreme Court held a violation of the gang participation offense requires proof the "felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member."  (*Id*. at p. 1132.)  The court explained that the Legislature's use of the plural noun "members" required the conduct to be committed by more than one person.  As relevant here, the court further explained the term "that gang" as used in section 186.22(a) "clearly refers back to the gang in which the defendant is an active participant."  (*Rodriguez*, at p. 1131.)  The court arrived at its conclusion through

13.

statutory construction relying upon the plain language of the statute itself. (*Id*. at p. 1132.)

In interpreting the statute in such a way, the court reasoned the "Legislature … sought to avoid punishing mere gang membership in section 186.22(a) by requiring that a person commit an underlying felony with at least one other gang member." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1134.) Noting that section 186.22(a) punishes criminal activity by gang members without requiring the conduct itself be gang related, the court explained the Legislature "purposefully used the phrase 'by members of that gang' to qualify the scope of the statute." (*Rodriguez*, at p. 1133.) Requiring a person commit the underlying criminal conduct with at least one other person demonstrates the Legislature did not intend to punish mere membership in the gang, thus alleviating any potential due process concerns with the statute. (*Id*. at pp. 1133-1135.) The plurality concluded that by enacting section 186.22(a), "the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang related." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1138.)

Defendants contend their convictions for the gang participation offense must be reversed under the holding in *Rodriguez* because there was no evidence either defendant committed the offenses at issue with another member of their respective gangs. The People counter the evidence established both defendants are members of the larger Sureño organization, therefore, defendants each committed the crime with another member of his own gang when they committed the instant offenses together. Relying on this court's prior opinion in *People v. Williams* (2008) 167 Cal.App.4th 983, the People argue that members of multiple factions of a larger gang can be considered as one gang. We note a similar issue is currently pending review by the California Supreme Court in *People v. Prunty*, review granted June 26, 2013, S210234, where the court is considering whether "evidence of a collaborative or organizational nexus" is required before multiple subsets of the Norteños can be treated as a criminal street gang pursuant to section 186.22, subdivision (f). We need not determine whether defendants' gangs could be

14.

considered parts of one gang in this case, however, as the evidence was insufficient to support a finding that the larger Sureño organization qualified as a "criminal street gang" pursuant to section 186.22.

A "criminal street gang" within the meaning of section 186.22 is defined as

> "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

At trial, the parties stipulated the Varrio Bakers and South Side Bakers were criminal street gangs within the meaning of section 186.22, subd. (f).[4]  However, there was no

---

[4]Salas argues the stipulation was insufficient because it failed to delineate that gangs participated in a pattern of criminal gang activity.  We disagree.  Initially, we note Salas moved in limine to *require* the prosecution to accept a stipulation as to the status of the Varrio Bakers as a criminal street gang to prevent the prosecution from establishing a pattern of criminal gang activity.  After an off-the-record discussion regarding the matter, the parties agreed to stipulate both the Varrio Bakers and South Side Bakers were criminal street gangs within the meaning of section 186.22.  As such, the People would not provide evidence of the predicates.  The parties agreed the jury would be informed through the stipulation that the gangs qualify as "criminal street gangs" and the instructions would reflect the stipulation.

Subsequently, at the close of the prosecution's case, the parties stipulated both the Varrio Bakers and the South Side Bakers "qualify as a criminal street gang as defined in the jury instructions."  The jury was instructed with CALCRIM No. 1400, which informed the jury of the elements required to find a violation of section 186.22(a).  That instruction defined the term "criminal street gang" using identical language as section 186.22, subdivision (f), requiring, as relevant here, the members of the gang engage in a pattern of criminal gang activity.  By stipulating the Varrio Bakers and South Side Bakers were criminal street gangs within the meaning of the instruction, the parties stipulated each and every element establishing a criminal street gang had been proved.  As such, the stipulation encompassed the fact the gangs engaged in a pattern of criminal gang activity.

In accordance with the stipulation, the jury was subsequently instructed, "The parties previously stipulated that the South Side Bakers and the Varrio Bakers are criminal street gangs within the meaning of these instructions."  Salas's complaint regarding the stipulation seems to be centered upon the fact the parties never provided the jury with a stipulation on the record that the gangs engaged in a "pattern of criminal gang activity."  However, a review of the above record makes clear the stipulation that the Varrio Bakers and South Side Bakers were criminal street gangs within the meaning of the instructions encompassed the element that the gangs engaged in a pattern of criminal activity.  This conclusion is supported by the fact the

15.

similar stipulation regarding the Sureño organization as a street gang. Likewise, there was no evidence presented at trial regarding the necessary elements of a criminal street gang as related to the Sureños. There was no evidence establishing (1) the number of members of the organization, (2) the primary activities of the organization, nor (3) whether its members engaged in a "pattern of criminal gang activity" as defined in the statute. The stipulations regarding the South Side Bakers and Varrio Bakers, while sufficient to establish they qualified as criminal street gangs within the meaning of the statute, simply did not encompass the Sureño organization.

During trial, Littlefield often referred to the Sureños as an "organization" or a set of principles rather than a gang. In fact, during cross-examination, Littlefield testified the Sureños were not a gang, but rather an "ideology." He also agreed the fact someone was a Sureño did not necessarily mean that person belonged to a criminal street gang.

Although Littlefield used the term "gang" at times when referring to the Sureños, the necessary evidence required to qualify the Sureños as a "criminal street gang" within the meaning of the statute was never produced at trial. While there was some evidence the Sureños as a whole identified with certain words and symbols, such as the number 13, the kanpol, and the color blue, this evidence fell short of providing information the Sureños were in fact a criminal street gang within the meaning of section 186.22. (Cf. *In re Jose P*. (2003) 106 Cal.App.4th 458, 467 [evidence was sufficient to establish Norteño was a criminal street gang as the evidence established the number of members, the color and symbols associated with the gang, that the gang engaged in enumerated primary actives, and specific evidence detailed that members of the gang engaged in a pattern of criminal activity].) Because there was no evidence the Sureños qualified as a criminal

---

instructions provided the "parties have stipulated that members of the South Side Bakers and the Varrio Bakers have participated in a pattern of criminal gang activity, there is no stipulation regarding knowledge thereof." Therefore, we reject any claim the parties never stipulated each gang in fact engaged in a pattern of criminal gang activity.

street gang within the meaning of section 186.22, subdivision (f), we cannot consider this group as the criminal street gang for the gang participation offense.

As there was no evidence produced at trial from which the jury could conclude both defendants were members of the Sureño criminal street gang as defined in the statute, the evidence was insufficient to support a finding defendants were members of the same gang. Rather, the jury was provided with evidence defendants were members of separate criminal street gangs, namely the Varrio Bakers and South Side Bakers, who shared common ideology and principles with the Sureño organization. The People, rightly, make no argument the Varrio Baker and South Side Baker gangs could be considered the same gang for purposes of the gang participation offense as the evidence established each was a distinct gang. While they both had some allegiance to the larger Sureño organization, the evidence presented at trial was simply insufficient to conclude the Sureño organization was a criminal street gang within the meaning of the statute. Therefore, the evidence was insufficient to support a finding defendants engaged in the gang participation offense with another member of their own gang. As such, that count must be reversed as to both defendants.

Our resolution makes it unnecessary to reach defendants' further arguments regarding the sufficiency of the evidence on the gang participation offense.

## C. Gang-Murder Special Circumstance Allegation

Defendants raise a number of issues relating to the gang-murder special circumstance allegation, claiming the evidence was insufficient to prove they had knowledge of the criminal purpose of their gangs, and murder was not carried out to further their gangs' activities. Additionally, Salas argues the evidence was insufficient to support a finding he was an active participant of the criminal street gang. In supplemental briefing, Salas also argues under the reasoning of *Rodriguez* that he must be an active participant in the gang that is benefited from the murder.

We need not address defendants' arguments as they relate to the gang-murder special circumstance. The sole purpose of a special circumstance finding is to mandate a

17.

sentence of life without the possibility of parole.  (§ 190.2, subd. (a).)  In addition to the gang-murder special circumstance, the jury also found true the allegation that defendants committed the murder during the commission of a robbery.  A murder committed in the course of a robbery is also a special circumstance mandating a sentence of life without the possibility of parole.  (§ 190.2, subd. (a)(17)(A).)  Defendants do not challenge the jury's finding regarding the murder in the course of a robbery special circumstance.  Therefore, were we to agree with defendants' contentions the gang-murder special circumstance was not supported by the evidence, the trial court was still required to impose a sentence of life without the possibility of parole based upon the robbery-murder special circumstance.  In short, the finding of the gang-murder special circumstance is irrelevant under the facts of this case and any supposed error in making the finding without sufficient supporting evidence is necessarily harmless.  (*People v. Dominick* (1986) 182 Cal.App.3d 1174, 1202 ["any error in regard to this special circumstance is harmless under the facts of this case because defendants did not receive the death penalty and there is a second special circumstance allegation which must be upheld"]; cf. *People v. Zimmerman* (1984) 36 Cal.3d 154, 161 [alleged error in excluding potential jurors in capital case deemed harmless error where defendant was not actually sentenced to death].)  At sentencing the court imposed the life-without-the-possibility-of-parole sentence based solely upon the robbery-murder special circumstance.  The court never mentioned the gang-murder special circumstance when it imposed the sentence in this case.  Further, we note the abstracts of judgment for both defendants reflect only the robbery-murder special circumstance.  As any error in finding the gang-murder special circumstance true was necessarily harmless, we need not address the issue.

18.

## II.     Motion to Sever

Salas[5] claims the trial court's denial of the motion to sever his case from Casica's denied him his right to due process and a fair trial because he was subjected to admission of prejudicial gang evidence regarding Casica's gang association and prejudicial testimony from the gang expert.[6]  These are the only grounds asserted by Salas, thus we will limit our review to these issues.  After reviewing the record, we find Salas was not denied due process or a fair trial from the denial of the motion to sever the cases.

Section 1098 provides in pertinent part:  "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials."  Under this section, "a trial court *must* order a joint trial as the 'rule' and *may* order separate trials only as an 'exception.' [Citation.]"  (*People v. Alvarez* (1996) 14 Cal.4th 155, 190.)

> "'A "classic" case for joint trial is presented when defendants are charged with common crimes involving common events and victims.' [Citation.]  Though severance is in the sound discretion of the trial court, severance should generally be granted '"in the face of an incriminating confession [by a codefendant], prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony."'  [Citations.]"  (*People v. Pinholster* (1992) 1 Cal.4th 865, 932, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; see *People v. Massie* (1967) 66 Cal.2d 899, 916-917; cf. *Zafiro v. United States* (1993) 506 U.S. 534, 539.)

The foregoing factors are not exclusive and are most often applied in cases, such as the present, involving defendants who are charged with crimes arising out of the same

___

[5]It does not appear Casica has joined this contention as he has not provided any argument in his supplemental opening brief or reply brief that the failure to sever the cases prejudiced him in any way.  We fail to see how this argument would benefit him, as the basis of Salas's argument is that it was the evidence against Casica that was prejudicial to Salas.

[6]As the admission of the particular statement regarding the testimony of the gang expert is raised by both defendants in a different argument, we will address the evidence there.

episode, as opposed to separate occasions. (*Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 938.)

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 575.) A trial court abuses its discretion when its ruling "falls outside the bounds of reason." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.) "If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 452, disapproved on other grounds in *People v. Black* (Mar. 27, 2014, S206928) __ Cal.4th __.)

Salas claims severance was required because a joint trial exposed him to prejudicial evidence regarding Casica's gang association that would not otherwise have been admissible at trial against him alone. We disagree. At the time of the rulings, the trial court could reasonably conclude the challenged evidence would have been admissible at separate trials. As both defendants were charged with the exact same crimes against the same victim, this case represented a "classic" case for a joint trial. Defendants were charged with conspiring to kill the same victim and committing the murder together during the course of a robbery and for the benefit of their respective gangs. The gang evidence was relevant against both Salas and Casica on matters other than predisposition to commit the crimes. Specifically, the evidence was relevant to the substantive gang charge, the gang enhancement, and the gang-murder special circumstance allegation.[7]

---

[7]Although we have reversed the gang participation count and declined to reach the issue regarding the gang-murder special circumstance, we note the gang enhancement (§ 186.22, subd. (b)), which attached to all of the charges, was also found true and is not challenged in this appeal. Because we are to analyze the propriety of the trial court's ruling at the time it was made, we still reference the other charges. As we shall explain, however, the same analysis also applies to the remaining gang enhancement.

Further, the evidence relating to Casica's gang membership and the activities of his gang would have been relevant even at a separate trial. Salas was charged with, and convicted of, the gang enhancement under section 186.22, subdivision (b). Pursuant to that section, the prosecution had to show Salas (1) committed the crime for the benefit of, at the direction of, or in association with, a criminal street gang; and (2) he had the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.) This section does not require a defendant to be a member of a gang, but only act in association with a gang with the intent to assist in criminal conduct by its members. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) Thus, evidence relating to Casica and his gang would be relevant to show Salas acted in association with the South Side Bakers with the specific intent to assist in any criminal conduct by Casica.

Even assuming some of the evidence relating to Casica might have been inadmissible as to Salas, such evidence was not so prejudicial that severing defendants' trial was required. First, we note evidence admissible as to one defendant and inadmissible as to the other does not necessarily preclude a joint trial of the two defendants. (*People v. Chambers* (1964) 231 Cal.App.2d 23, 33 ["Reported California decisions do not regard this circumstance as an ineluctable demand for separate trials"]; see *People v. Soper* (2009) 45 Cal.4th 759, 779-780 [lack of cross-admissibility alone insufficient to support finding trial court's denial of severance motion is abuse of discretion].)

Second, we must be cognizant that a "prejudicial association justifying severance will involve circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.) Salas argues the jury likely convicted him based not upon the evidence

21.

but because he associated with Casica, a member of the South Side Bakers. Salas's argument fails to take into account the fact the jury was already informed that he, too, was a gang member. While Casica's gang involvement was more extensive than Salas's involvement, there is nothing indicating the jury attributed Casica's gang involvement to Salas. This is not a case where one defendant was a gang member while the other was not. Both were involved in gangs, both were charged with a substantive gang offense, a gang enhancement, as well as the gang-murder special circumstance allegation. The type of evidence of which Salas complains—namely, photographs of tattoos and graffiti from the gangs—was similar for both defendants. It was clear at trial that Salas and Casica were members of different gangs, and the jury was instructed to consider the evidence of each defendant separately. We presume it followed this instruction (*People v. Yeamon* (2003) 31 Cal.4th 93, 139), and there is nothing in the record suggesting the contrary. That each defendant's involvement was considered separately is evident from the fact the jury found Salas did not premeditate the murder and also acquitted him of the firearm charge. (See *People v. Thomas* (2012) 53 Cal.4th 771, 801.) The fact the jury clearly considered the evidence as to each defendant separately further weakens Salas's argument he was prejudiced by the denial of the motion to sever.

Salas relies on *People v. Chambers*, *supra*, 231 Cal.App.2d 23 to support his argument severance should have been granted because of prejudicial association between defendants. *Chambers* is of no help to Salas. There, the defendant was charged with one count of assault on a patient at a rest home for aged and mentally ill patients. Chambers was jointly tried with Sarah Spitler. Spitler was charged with three separate assaults on patients. None of these was the same assault Chambers was charged with. The trial was replete with "voluminous evidence of unrelated acts of brutality by Mrs. Spitler, admissible only because she was on trial for offenses unrelated to that charged against Chambers." (*Id.* at p. 27.) The jury also heard Chambers owned the rest home, was Spitler's employer, and when Spitler was arrested she was "in Chambers' bedroom, he being in bed." (*Id.* at p. 29.) The appellate court concluded, "The record impresses us

22.

with the belief that Chambers was probably fastened with vicarious responsibility for the long-continued brutality of Mrs. Spitler, in the absence of any charge of concerted or conspiratorial action." (*Ibid.*)

Unlike *Chambers*, most of the trial evidence here was not about Salas's codefendant. The case against Casica was no stronger than the case against Salas, as both were tried for the exact same crime with virtually identical evidence. As they were charged with the identical crimes occurring at the same time against the same victim, the evidence was admissible as to both. The evidence relating to Casica's gang association was no more prejudicial than Salas's own gang association, consisting of photographs of gang tattoos on other members and graffiti of gang names. Moreover, we do not find the evidence admitted against Casica that Salas complains of to be the kind of evidence invoking a prejudicial association. He complains specifically of the gang writings found next to the victim's body, photographs of tattoos and graffiti showing gang symbols, and the picture of Casica displaying his tattoos and holding the guns taken in the robbery. But none of this evidence was inherently inflammatory; rather, the evidence was relevant to show the circumstances of the crime, the identity of the perpetrators, as well as the relationship between the two gangs.

Salas argues the evidence against him was not identical to the evidence against Casica because there was evidence of his leaving the victim's home for a short time to obtain drugs. He concludes the case was substantially weaker against him. Not so. Salas's argument fails to recognize both he and Casica were charged with conspiracy to commit the murder, as well as the fact the prosecution used an aiding and abetting theory against Salas regarding the murder. Under these theories, evidence of Casica's actions at the house, even while Salas was not present, would still have been admissible against Salas. (See *People v. Morante* (1999) 20 Cal.4th 403, 417 [members of conspiracy need not be present nor personally participate with coconspirators in commission of overt acts to be liable for conspiracy]; *People v. Hardy* (1992) 2 Cal.4th 86, 188 [defendant liable for actions taken by other members of conspiracy as long as coconspirators act to achieve

23.

underlying object of conspiracy and acts were natural and probable consequences of coconspirator to further conspiracy]; *People v. Pelayo* (1999) 69 Cal.App.4th 115, 121 [defendant need not be present at scene of crime to be guilty of aiding and abetting crime]; *People v. Lopez* (1981) 116 Cal.App.3d 882, 885 [same].) The evidence established Salas and Casica arrived at the victim's home together, exchanged text messages about killing her, left the home together, and jointly loaded property into the vehicle that took them from the scene. In addition, forensic evidence established both defendants were present in the room where the victim was killed.

Based on the evidence, it was unlikely Salas was absent from the home at the time of the murder. Salas left the home for approximately one hour between 3:00 and 4:00 a.m. The evidence indicated Salas returned shortly after 4:00 a.m. and the murder likely took place shortly before 5:00 a.m. The evidence indicated Salas left the residence to obtain more drugs. As there were additional drugs present both next to the victim and in her hand when she was killed, the evidence suggests Salas had returned before the murder. Moreover, there were text messages sent from Salas's phone shortly before 5:00 a.m. stating he needed to be picked up immediately. The phone records established defendants left the area sometime after 5:00 a.m., which corresponds with Thompson's testimony of the approximate time she picked up defendants from the victim's home. Thus, the case against the two was similar.

Based on the foregoing, it is clear that, when viewed at the time of the motion, the trial court's denial of the motion to sever the cases did not constitute an abuse of discretion. Anticipating this holding, Salas argues his right to due process was violated in the course of the joint trial based upon the evidence actually admitted. We disagree.

In arguing the evidence of Casica's gang involvement was unduly prejudicial, and therefore a violation of his right to due process, Salas relies on *People v. Albarran* (2007) 149 Cal.App.4th 214. There, the appellate court found the admission of gang evidence violated due process and rendered the trial fundamentally unfair. (*Id.* at p. 232.) The court summarized the law applicable to a due process claim as follows:

24.

"To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is … whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran*, *supra*, at pp. 229-230.)

In *Albarran*, the defendant was charged with multiple offenses based on his participation in a shooting at the victim's home. He was not charged with the gang substantive offense, but gang enhancements were alleged. (*People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 217-220.) The trial court permitted the prosecution to introduce gang evidence to prove the defendant's motive and intent. The jury convicted the defendant of the substantive offenses and found the gang enhancements were true. Thereafter, the court granted a motion to dismiss the gang allegations for insufficient evidence. (*Id.* at p. 222.)

*Albarran* held that while the trial court may have initially found the defendant's gang activities were relevant and probative to his motive and intent, the court abused its discretion when it permitted the prosecution to introduce additional gang evidence that was completely irrelevant to the defendant's motive or the substantive criminal charges. (*People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 224-225.) The irrelevant evidence included other gang members' threats to kill police officers, descriptions of crimes committed by other gang members, and references to the Mexican Mafia prison gang. *Albarran* characterized the irrelevant gang evidence as "extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id.* at p. 230, fns. omitted.) *Albarran* also classified this evidence as "overkill," and said it was "troubled" by the trial court's failure to scrutinize the potential prejudice of the gang offense on the substantive charges. (*Id.* at p. 228.) *Albarran* found the irrelevant and prejudicial gang evidence was

25.

so inflammatory it "had no legitimate purpose in this trial" and held its admission violated the defendant's due process rights. (*People v. Albarran*, *supra*, at pp. 230-231.)

The instant case is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 232.) In contrast to *Albarran*, Salas was charged with both the gang participation offense and the gang enhancement. While we have reversed the gang participation charge, Salas still stands convicted of the gang enhancement that attached to each of the charges. The evidence introduced on the reversed counts also was introduced to support the remaining gang enhancement.

Specifically, section 186.22, subdivision (b) required proof that Salas committed the crimes "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Proof of a violation of this section may be established by showing Salas acted to benefit his own gang or that he acted to further Casica's gang. (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198; *People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322.) Under these theories, the evidence relating to Casica's gang affiliation was relevant to show Salas's knowledge of Casica's gang affiliation, as well as to show either his intent to benefit Casica's gang or his intent to commit the crime in association with Casica. Likewise, evidence of Salas's own gang affiliation is relevant to show his intent to benefit his own gang or to show the cooperation between the gangs. Therefore, the evidence of both defendants' gang affiliation and the other gang evidence was still relevant to the charges against Salas.

More importantly, the expert testimony regarding the criminal activities of the South Side Bakers and Varrio Bakers was not similar to the sensational and prejudicial testimony admitted in *People v. Albarran.* It cannot go unnoticed that Littlefield never addressed any prior criminal conduct allegedly committed by Salas. Furthermore, there was very little evidence regarding the criminal conduct of either gang. Littlefield never

testified to the primary activities of either gang or to any specific criminal conduct by other gang members as these elements were met through the stipulations. Rather, much of the testimony was centered on how gangs operate and their ideology.

The gang evidence in this case was no more sensational than the evidence as to the murder and robbery charges against Salas. We cannot say the nature and quantity of the evidence was such that it must have affected the jurors' resolution of the substantive issues. Thus Salas's due process contention fails.[8]

Finally, Salas presents a novel argument, claiming his "trial attorney was unable to prepare for or control Casica's trial attorney's questions to adverse witnesses." He claims those questions "led to testimony damaging to [Salas's] defense." Severance, he claims, would have "prevented this problem and assured [Salas's] right to a fair trial." Salas does not support this argument with any analysis or authority, other than a citation to the general right to effective assistance of counsel. Because he just presents the above conclusory statement, the issue has not sufficiently been raised on appeal. However, we note that, even if raised, Salas would be unable to satisfy the prejudice required to effect a claim of ineffective assistance of counsel. As we have already explained, the gang expert testimony Salas complains of was not prejudicial. Thus, his claim necessarily fails. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 [defendant must demonstrate reasonable probability of more favorable outcome without the error].)

## III.    *Batson/Wheeler* Claims

Defendants make several claims relating to the exercise of peremptory challenges by the prosecutor. They argue that in excusing prospective juror B.R., the prosecutor engaged in a discriminatory practice, and the trial court erred in allowing the prosecutor to provide his reasons for excluding other jurors in a sealed declaration. According to defendants, this procedure violated ethical rules and constituted an ex parte

---

[8]Salas also contends specific testimony from the gang expert was prejudicial, denying him due process. As this issue is raised by Casica and joined by Salas in another argument, we will address it there.

communication that denied defendants their right to due process, to be present, and to have the assistance of counsel. We disagree.

## A.    Procedural History

Prior to conducting any voir dire, the trial court asked the panel as a whole, as is relevant here, whether there was (1) "anything about the nature of the case or the crimes charged that would affect your ability to be fair and impartial" or, (2) if there was "any reason you feel that you can't serve on this case" or, (3) if there was "any reason you feel you couldn't be a fair and impartial juror" or, (4) if anyone had "any feelings of prejudice or bias against any of the attorneys, parties, proposed witnesses or anyone in this courtroom?" Prospective juror B.R. answered this question in the affirmative. When she was questioned individually about her reason for answering affirmatively she stated, "[M]y reason is that it's more like a personal. I don't feel I'm anyone to decide anybody's fate. I'm not sure I could do it." The following exchange then took place:

> "[THE COURT:] Q. We're not asking you to render moral judgments. We leave that in higher hands. Right?
>
> "[B.R.:]  A. Yes.
>
> "Q. Only asking you to judge facts, circumstances, and evidence to decide if crimes were committed and if either of these two gentlemen committed any of those crimes. [¶] Would you have a problem doing that?
>
> "A. No.
>
> "Q. Okay. I want to make sure your answer wasn't because you think that's what I want to hear. There's no correct answer. The only correct answer is how you feel.
>
> "A. I wouldn't have a—I don't have a problem being impartial. It's just where it leads that I'm—that I'm not comfortable with.
>
> "Q. You understand jurors don't get involved in penalty or punishment.
>
> "A. Yes, I understand.
>
> "Q. This isn't a capital or death penalty case.

28.

"A. Yes, I understand.

"Q. Do you feel that you could give each of these gentlemen a fair trial?

"A. Yes.

"Q. I'm sorry?

"A. Yes."

Subsequently, B.R. was questioned as part of the jury panel. Neither the prosecutor nor Casica's counsel inquired of her, but counsel for Salas made a brief inquiry. After all parties passed for cause, the prosecutor exercised a peremptory challenge as to prospective juror B.R. Upon excusing the juror, Salas made a motion pursuant to *Batson/Wheeler*. Counsel for Casica joined in the motion. Specifically, defendants argued:

> "[T]here have been 10 peremptory challenges exercised by the People. At least six, or a majority of those, have been exercised against members of a protected, to wit, minority group.[9] Miss [S]., the first challenge; Miss [P.], the third challenge, Mr. [C.], who is an African-American, the fifth challenge; Miss [C.] by the seventh challenge; Mr. [M.] by the ninth challenge; and now Miss [R.] by the tenth challenge."

The trial court found as follows:

> "It would seem that you have made, at least on the basis of this one juror, not the others, but based on my—you've established a prima facie case only on this one juror, only on Miss [R.]
>
> "Do you care to give an explanation for the challenge on Miss [R.] or comment in regard to the other named jurors you excused of apparent Hispanic origin that might indicate why they were excused on a non-race-neutral—a non-race issue."

---

[9]We note that "minority group" is not a cognizable class for a *Batson/Wheeler* analysis. (See *People v. Davis* (2009) 46 Cal.4th 539, 583 ["people of color" not a cognizable group].) The defendants attempted to group two classes of jurors, African-American and Hispanic, as a single class, however, that is not a cognizable group. (*Ibid*.) Accordingly, we will treat the motion as it related only to Hispanic jurors.

29.

The prosecutor questioned whether the trial court was finding a prima facie case on all the named jurors or only as to B.R., and the trial court again clarified the finding only encompassed B.R. The trial court further stated, "but you can comment on the others, as well." The prosecutor declined to comment on the reasons for dismissing the other jurors, however, he asked for "leave of the Court to file papers that would be sealed as a Court exhibit on those, as well as Mr. [C.]" The court permitted this procedure. The prosecutor then stated his reason for excusing B.R., explaining she

> "came over with the panel on June 15th and she, in response to your hardship questions, answered in the affirmative and came back to speak with us, and when she did that on the hardship stage she said that although she thinks that she can be impartial, she's not sure that she could judge anybody. And it was my reading of that, after speaking with her and the conversations in court, that she would not be able to render a verdict.

> "That was consistent with what she said today, that she felt she could be impartial, that she had to keep an open mind, because that was the basis of her training and education, but at the hardship—and I even made a note of it at the time, that I didn't consider her to be a satisfactory juror based on that particular series of questions and answers.

> "THE COURT: An inability to reach a verdict?

> "[THE PROSECUTOR]: Yes. She could be impartial, but she didn't think—oh, actually, she didn't think she could judge anybody is what she said and she may not be able to render a verdict. So that was my reason for excusing Miss [R.]"

Counsel for Salas questioned the prosecutor's motivations, arguing the prosecutor did not challenge the juror for cause. Counsel for Casica joined in the comments and added that although he did recall B.R. speaking to the court earlier, once the court

> "explained to her that she was not judging persons morally, whether or not they'd be good persons, that kind of thing, and that she's not to be concerned with punishment, then she—it was my understanding she understood what her role was, and that is to be the judges of the facts and the judges of the evidence, and on that basis, then, she was allowed to remain on the panel."

30.

After stating B.R. had a degree in criminal justice and was currently a student seeking a master's degree to become a behavioral therapist, counsel for Casica argued the prosecutor had not "stated good cause for her removal."

The prosecutor replied:

"I'm not excusing her because of her class. I'm excusing her because she said she can be impartial, but she doesn't think she can judge anybody. It's my impression that she would have a difficult time rendering a verdict and that was consistent with what she said today."

The court held the prosecutor had "presented a race-neutral, group-neutral, basis for excusing her" and thus denied the *Wheeler/Batson* motion as to B.R. The court further found:

"[B]ased on my recollection of the other jurors that have been—that you did excuse, Hispanic surnames, that there has been a failure to establish an inference that they were excused because of group or race reasons. [¶] And as I indicated, we deny the Wheeler-Batson as to those individuals."

While continuing to examine the panel for jury alternates, Casica's counsel sought to preserve any *Batson*/*Wheeler* challenge by objecting to the jury as seated and noting he had exhausted his peremptory challenges. The prosecutor noted the seated jurors "seem[ed] representative of the community. They seem representative of the panel, of the general voir dire panel that we had. [¶] There's—by my memory, there's at least four Hispanics on it. There might be five out of 12. I think it seems fairly representative." The court then observed five of the seated jurors were Hispanic. The following day, a more complete record was made. The court reiterated the *Wheeler* motion was made on June 21st when B.R. was excused. At that time, the court explained it had concluded "a prima facie case had not been established as to the Hispanics excused by the People, with the exception of Ms. [R.]" Next, the prosecutor had offered his reasons for excusing B.R., and the court "felt there was a race-neutral reason for excusing Ms. [R.], who indicated that she wasn't sure she could judge anyone and her race-neutral reasons for her being excused, although [the court] found a prima facie showing." Further, after hearing the prosecutor's reasons, the court explained it "felt that the People had not exercised a

31.

challenge in a purposefully discriminatory manner and that—[the court] could not reasonably infer that it was for purposeful discrimination that she had been excused and that she had been excused for a genuine group-neutral reason by a preponderance of the evidence."

As to the court's ruling no prima facie case had been made regarding the other jurors, the court stated it found no reasonable inference the challenges were exercised for a discriminatory purpose. The court once again articulated there were five seated Hispanic jurors and one African-American juror.

### B.    Legal Standards

Defendants, who are Hispanic, challenge the trial court's denial of their *Batson/Wheeler* motion, which was brought as a result of the prosecutor's peremptory excusals of five prospective jurors who were Hispanic or at least Spanish-surnamed and one African-American prospective juror. Hispanics and African-Americans are a cognizable group for purposes of *Batson/Wheeler* analysis. (*People v. Clair* (1992) 2 Cal.4th 629, 652; *People v. Trevino* (1985) 39 Cal.3d 667, 686, disapproved on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221.) Spanish-surnamed prospective jurors are included in the cognizable Hispanic group, at least when no one knows at the time of the challenge whether the prospective juror is Hispanic. (*People v. Davis*, *supra*, 46 Cal.4th at p. 584; *People v. Cruz* (2008) 44 Cal.4th 636, 656-657.)

"The purpose of peremptory challenges is to allow a party to exclude prospective jurors who the party believes may be consciously or unconsciously biased against him or her." (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17.) Peremptory challenges may properly be used to remove prospective jurors believed to entertain specific bias, i.e., bias regarding the particular case on trial or the parties or witnesses thereto. (*Wheeler*, *supra*, 22 Cal.3d at p. 274.) However,

> "'[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"— violates the right of a criminal defendant to trial by a jury drawn from a

representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 596; see *Batson*, *supra*, 476 U.S. at pp. 88-89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)

"There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.)

"The United States Supreme Court has … reaffirmed that *Batson* states the procedure and standard to be used by trial courts when motions challenging peremptory strikes are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 541, quoting *Johnson v. California*, *supra*, 545 U.S. at p. 168.)

The California Supreme Court has "endorsed the same three-part structure of proof for state constitutional claims. [Citations.]" (*People v. Bell*, *supra*, 40 Cal.4th at p. 596; see *Wheeler*, *supra*, 22 Cal.3d at pp. 280-282.) With these principles in mind, we turn to the case before us.

### 1. The court's ruling no prima facie case was established was not rendered moot

The trial court found defendants failed to establish a prima facie case of discrimination as to the dismissal of all prospective jurors with the exception of B.R.[10]

---

[10]At oral argument, defendants questioned the propriety of the trial court's ruling finding a prima facie case as to only one of the challenged prospective jurors. Without citation to authority, defendants argued a trial court could not make a prima facie finding as to only some of the challenged jurors. Initially, we note no such argument was made in defendants' briefs and defendants provided no authority for their assertion at oral argument. Thus, the issue has not been adequately raised on appeal. (*People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4.) Furthermore, we note our Supreme Court has approved of such a ruling at least implicitly. In

33.

In hearing the *Batson*/*Wheeler* motion, the trial court stated the prosecutor could comment on the other jurors as well. The prosecutor declined this invitation. Instead, he requested and received permission to file a sealed declaration as to his reasons for dismissing the other prospective jurors. This was not filed until the day following the finding defendants had failed to establish a prima facie case as to the remaining jurors.

Defendants argue that "once the trial court invited the prosecution to submit his reasons for excusing the challenged jurors and he did so," the trial court likely "considered them and implicitly accepted them," rendering the question of a prima facie case moot. Defendants completely misconstrue the record and misapply the law.

When a trial court requests reasons for a peremptory challenge and subsequently rules on the ultimate question of intentional discrimination, the issue of whether a defendant established a prima facie case is rendered moot. (*Hernandez v. New York* (1991) 500 U.S. 352, 359; *People v. Taylor* (2010) 48 Cal.4th 574, 612-613; *People v. Lewis*, *supra*, 43 Cal.4th at p. 471.) "However, a trial court's request that the prosecutor provide reasons for his or her exercise of a peremptory challenge is not an implicit finding the defendant has established a prima facie case, and does not moot the issue, in every instance." (*People v. Taylor*, *supra* at p. 612.)

Here, the trial court *expressly* found no prima facie case of discrimination had been established, and the fact the trial court allowed the prosecutor to comment did not moot the issue. (*People v. Boyette* (2002) 29 Cal.4th 381, 422; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1091-1092, overruled on other grounds in *People v. Black*, *supra*, __

---

*People v. Yeoman* (2003) 31 Cal.4th 93, the trial court made a nearly identical ruling to the trial court's ruling in the present case. There, the defense counsel made a motion pursuant to *Wheeler* after the prosecutor excused a total of four African-American jurors. The trial court found no prima facie case had been established as to the first three prospective jurors, but the court did find a prima facie case as to the fourth prospective juror. (*Yeoman*, at pp. 115-117.) Our Supreme Court upheld each of the trial court's findings. (*Ibid*.) Thus, our Supreme Court has at least implicitly approved of the trial court's process of finding a prima facie case as to some, but not all, of the challenged jurors. We therefore reject defendants' assertion that the trial court's finding a prima facie case as to some, but not all, of the challenged prospective jurors was error.

34.

Cal.4th at p. __.) Defendants' argument the court "likely" considered and "implicitly accepted" the prosecutor's reasons for dismissing the prospective jurors is wholly unsupported by the record. The prosecutor never commented on the prospective jurors upon which the court found no prima facie case of discrimination on the record at the hearing where the court expressly found no prima facie case. In fact, the prosecutor *clarified* there was no prima facie case before requesting to file the sealed declaration, which was not filed until the next day. Thus, it was impossible for the court to consider or accept those reasons when it found no prima facie case had been established. Consequently, the finding was not rendered moot. (*People v. Welch* (1999) 20 Cal.4th 701, 745-746 [where court makes express finding of no prima facie case of discrimination, invitation to justify challenges to complete record for appeal does not render finding moot].) Further, as we will explain below, although the prosecutor did provide reasons for the other jurors under seal, apparently for appellate review, there is no evidence the trial court ever reviewed that document.

### 2. The court's finding regarding the reasons for excusing B.R. were supported by the record

The trial court explicitly found no prima facie case was made as to any prospective jurors except for B.R. Thus, the burden shifted to the prosecutor to state his reason for the exercise of that challenge. Once he did so, it was the trial court's responsibility to evaluate the reason. We will now address that finding.[11]

---

[11]To the extent defendants argue the trial court erred in finding no prima facie case as to the other mentioned jurors, counsel has not adequately raised the issue for review. The only sentence in defendants' briefs potentially raising the issue states that because the prosecution challenged one African-American and five Hispanic potential jurors, this alone "is enough to show to permit an inference of discriminatory strikes." Defendants go on to argue their burden to state a prima facie case is small and low, and then cite three cases arguing a court can make an inference of discrimination where the prosecution strikes a disproportionate number of members of a racial group, or has a pattern of striking minority members. Defendants do not state the standard of review for reviewing the denial of a finding of a prima facie case, do not attempt to engage in any meaningful analysis of the issue, and do not point to anything in the record establishing a pattern of disproportionate removal of minorities other than the motion itself. An argument unsupported by legal or factual authority is not deemed raised on review. (*People v.*

The trial court ruled for the defense in step one of the *Batson/Wheeler* analysis by finding a prima facie case of improper discrimination as to B.R. only. We assume substantial evidence supports those determinations. (See *People v. Silva*, *supra*, 25 Cal.4th at p. 384; *People v. Alvarez*, *supra*, 14 Cal.4th at p. 197.) Accordingly, we move to step two.

At step two, the prosecutor must come forward with a race-neutral explanation for each challenged excusal. (*People v. Silva*, *supra*, 25 Cal.4th at p. 384.)

> "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's

---

*Harper*, *supra*, 82 Cal.App.4th at p. 1419, fn. 4.) Further, defendants' argument is under the heading "Once The Court Invited The Prosecution To Comment On His Reasons For Striking The Other Jurors, The Court's Finding Of That The Defense Failed To Make A Prima Facie Showing Was Moot." However, pursuant to California Rules of Court, rule 8.204(a)(1)(B), counsel must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." Given these factors, we find the issue was not raised by the briefs.

Even if we were to consider the issue, the only argument made regarding the ruling that no prima facie case was made was simply the number of challenges exercised. However, defendants have not provided this court with any evidence regarding how many Hispanic or African-American jurors were on the jury panel, or whether the percentage stricken was disproportionate to the panel as a whole. We cannot evaluate such a claim in a vacuum. Indeed, what evidence we have before us supports an inference of nondiscriminatory intent. At the time the defense made the motion, they claimed that out of the 10 peremptory challenges then used by the prosecution, five were against Hispanic individuals. This would constitute 50 percent. Of the seated jury, five out of 12 members were Hispanic, or approximately 42 percent. The closeness of the number of those excused as well as those empanelled suggests the challenges were proportionate to the general makeup of the panel. Moreover, the courts have repeatedly held mere statistics alone do not necessarily lead to an inference of discrimination. (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 344 [prosecution's striking of three of eight total Hispanic jurors in jury pool was insufficient to raise inference of discrimination]; *People v. Garcia* (2011) 52 Cal.4th 706, 747-748 [no prima facie case of discrimination where first three prosecution challenges were against women; women comprised 56 percent of pool, prosecution used 50 percent of its challenges on women, and total of 10 women empanelled].) While it is true a prima facie case *may* be established by a statistical disparity (*U.S. v. Collins* (9th Cir. 2009) 551 F.3d 914, 921), no such disparity has been shown here, where no evidence was provided that the number of Hispanics challenged was in some way disproportionate to the panel as a whole.

explanation, the reason offered will be deemed race neutral." (*Hernandez v. New York*, *supra*, 500 U.S. at p. 360 (plur. opn. of Kennedy, J.).)

At this stage, the explanation need not be persuasive, or even plausible. (*Purkett v. Elem* (1995) 514 U.S. 765, 767-768.)

> "'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 613, italics omitted.)

Whether the prosecutor has offered a race-neutral reason for his or her peremptory challenges is a question of law subject to our independent review. (*People v. Alvarez*, *supra*, 14 Cal.4th at p. 198, fn. 9; *Paulino v. Harrison* (9th Cir. 2008) 542 F.3d 692, 699.) As no discriminatory intent was inherent in any of the prosecutor's reasons, we conclude those reasons were race neutral (*Hernandez v. New York*, *supra*, 500 U.S. at p. 360 (plur. opn. of Kennedy, J.)); hence, the prosecutor met his burden with respect to step two of the *Batson/Wheeler* analysis.

Accordingly, we move to step three. At this stage of the analysis, the trial court must decide whether the opponent of the peremptory strike has proved purposeful racial discrimination by a preponderance of the evidence. (*Purkett v. Elem*, *supra*, 514 U.S. at p. 767; *People v. Hutchins* (2007) 147 Cal.App.4th 992, 997-998.) The persuasiveness of the proffered justification now becomes relevant (*Johnson v. California*, *supra*, 545 U.S. at p. 171), as implausible or fantastic justifications will often be found to be pretexts for purposeful discrimination (*Purkett v. Elem*, *supra*, at p. 768). "What is required are reasonably specific and neutral explanations that are related to the particular case being tried." (*People v. Johnson*, *supra*, 47 Cal.3d at p. 1218.)

> "Therefore, '[a]t the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis

37.

in accepted trial strategy." [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]'" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 102.)

Once the prosecutor comes forward with such an explanation, the trial court must then satisfy itself that the explanation is genuine. (*People v. Hall* (1983) 35 Cal.3d 161, 167.) "In [this] process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720.)

> "This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.]" (*People v. Hall*, *supra*, at pp. 167-168; see also *People v. Lomax* (2010) 49 Cal.4th 530, 570-571.)

In undertaking this evaluation, the trial court need not make affirmative inquiries, but must find the race-neutral explanations to be credible. (*People v. Hamilton* (2009) 45 Cal.4th 863, 907.) "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) "When a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its ruling, reviewing it under the substantial evidence standard. [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 104-105; accord, *People v. Lenix*, *supra*, 44 Cal.4th at p. 627; see *Paulino v. Harrison*, *supra*, 542 F.3d at p. 699.) Deference does not, of course, "imply abandonment or abdication of judicial review." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 340.)

The record before us clearly establishes the trial court made a sincere and reasoned effort to evaluate the prosecutor's stated reasons for his peremptory challenge. In reviewing the reasons for denying the motion after the jury was empanelled, the court explained there was a race-neutral reason for excusing B.R., namely, she stated she could not judge anyone. Further the court "felt that the People had not exercised a challenge in a purposefully discriminatory manner and that [it] could not reasonably infer that it was for purposeful discrimination that she had been excused and that she had been excused for a genuine group-neutral reason by a preponderance of the evidence." It is clear the trial court did not simply reiterate the prosecutor's reason. Rather, it found the reason was genuine and supported by the record. We agree.[12]

The prosecutor's reason for excusing the prospective juror was both inherently plausible and supported by the record. (See *People v. Silva*, *supra*, 25 Cal.4th at p. 386.) The prosecutor noted B.R. stated she had a problem judging people and she was unsure whether she could do so. That she ultimately said she could be fair and impartial does not lessen the impact of her statement. The prosecutor would very obviously not want anyone on the jury who was unable to render a verdict or who was uncomfortable doing so.

Defendants argue B.R.'s statement that she could be fair and impartial and she understood she was not responsible for determining punishment demonstrates the prosecutor's reason for excusing her was pretextual. Defendants' contention fails on two grounds. First, a fair reading of the record supports the prosecutor's conclusion that

---

[12]When "the trial court has not conducted any inquiry and has not made any particularized findings, but the prosecutor's explanations are both plausible and supported by the record, [our Supreme Court] has not found reversible error in the denial of the defense motion." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 931; see *People v. Ward* (2005) 36 Cal.4th 186, 205 [no detailed findings by trial court necessary where stated reasons not contradicted by record or inherently implausible].) Indeed, *Green v. LaMarque* (9th Cir. 2008) 532 F.3d 1028, the case upon which defendants rely, does not hold differently. Rather, it notes the court engages in a de novo review when the lower court fails to determine whether the prosecutor engaged in purposeful discrimination. (*Id.* at pp. 1030-1031.) Here, as we will explain, our review demonstrates the prosecutor's explanations are indeed plausible and supported by the record.

39.

although B.R. stated she could be fair, she clearly expressed reservations about being able to judge another person. She expressed this sentiment, not once but twice, and on her own accord. It is important to note B.R. initially was questioned for cause by the court because she stated she did not "feel [that she was] anyone to decide anybody's fate." Upon further questioning she stated, "I don't have a problem being impartial. It's just where it leads that I'm—that I'm not comfortable with." Thus, the record clearly supports the prosecutor's stated race-neutral reason for exclusion.

Second, we reject defendants' argument B.R.'s ultimate statement eliminated the prosecutor's basis to question her ability to deliberate. Essentially, they are asserting since there was no basis to excuse B.R. for cause, the peremptory challenge was invalid. Not so. The prosecutor is not required to provide a justification for cause in order to support the denial of a *Wheeler/Batson* motion. (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 102; *People v. Martin* (1998) 64 Cal.App.4th 378, 384 ["we emphasize that the justification for a peremptory challenge need not rise to grounds for a challenge for cause; the prosecutor need not show *actual* bias"].)

In *People v. Rushing* (2011) 197 Cal.App.4th 801, 812, the court explained a prosecutor "is not required to accept at face value a prospective juror's assurance that, despite an answer indicating the contrary, she would have no problem being neutral. In such cases, the juror's apparent uncertainty is a legitimate reason for exercising a peremptory challenge." B.R.'s expressed hesitancy in being able to judge someone clearly provided the prosecutor with a legitimate concern as to whether she would be able to reach a verdict.

The present case is analogous to *People v. Martin*, *supra*, 64 Cal.App.4th 378. There a prospective juror initially indicated on a questionnaire she had "'moral, religious, or other principals [*sic*] that make it difficult to determine whether someone is guilty or not.'" (*Id*. at p. 381.) Upon further questioning she stated that, due to her religion, she would have a problem in a case where the death penalty was at issue. She also indicated her beliefs would not cause her an issue where, as there, the death penalty was not

involved. (*Ibid*.) The prosecutor excused the juror, explaining the juror was a Jehovah's Witness and in his experience Jehovah's Witnesses had difficulty in judging people, and he did not want to take a chance on someone who had expressed any hesitancy in judging a person. The appellate court found the denial of the *Wheeler* motion in that case was proper. Although the juror "did not express actual reservations about her ability to deliberate," the prosecutor was not required to show grounds that amounted to a challenge for cause. Rather, the "prosecutor's perception that the juror's religious views might render her uncomfortable with sitting in judgment of a fellow human being was a specific bias related to the individual juror's suitability for jury service." (*Id*. at p. 384.) Likewise here, contrary to defendants' argument otherwise, the prosecutor was not required to state reasons that amounted to a challenge for cause.

Defendants' additional contention the prosecutor failed to further question B.R. also does not compel the conclusion the stated reason was pretextual. Defendants have cited no cases holding the failure to question a juror necessarily leads to a finding of discrimination. While cases have held this factor may be considered and, in combination with other factors, can be used to support a finding the stated reason was pretextual, those circumstances do not present themselves here. Indeed, both *Miller–El v. Dretke* (2005) 545 U.S. 231 and *Lewis v. Lewis* (9th Cir. 2003) 321 F.3d 824—cases upon which defendants rely—hold that a prosecutor's failure to ask questions related to his or her stated concerns about a juror *can* support a finding those concerns are pretextual. However, both of these cases involved significant evidence of discriminatory intent. In *Miller–El* there was a clear imbalance in the questioning of Black and non-Black jurors. (*Miller-El v. Dretke*, *supra*, at pp. 244-245.) In *Lewis*, the prosecutor's failure to ask followup questions was only one of several reasons why the court rejected the prosecutor's explanation as pretext. (*Lewis v. Lewis*, *supra*, at pp. 832-833.) Among these reasons was the fact the trial court found two or more of the prosecutor's other stated reasons to be pretextual, "undermin[ing] his credibility." (*Ibid.*) No such issues

41.

were present here. It was not unreasonable for the trial court to conclude the prosecutor genuinely was concerned about the juror's discomfort with her ability to render a verdict.

Defendants argue for the first time in the reply brief that the prosecutor's stated reason "does not ring true" because "at least three other prospective jurors were questioned extensively about their inability to reach verdicts, for different reasons, and were excused for cause." Defendants' argument misses the mark. Like B.R., each of the prospective jurors to which defendants refer answered affirmatively to the court's initial questions designed to ferret out issues of bias or hardship. Each also indicated they would have some problem being fair and impartial or in reaching a verdict. During the questioning, conducted solely by the court, each of these prospective jurors stated, in certain terms, they could not be fair to one side or they could not reach a verdict. To the extent defendants are seeking some sort of comparative analysis, it is clear that is inappropriate, as each of those jurors were also excused and did not sit on the jury.

Furthermore, the fact the prosecutor did not question B.R. does not lead to an inference of discrimination since the prosecutor did not question the other jurors either. They were all dismissed for cause by the trial court after very limited questioning established they could not be fair. In short, the prosecution's treatment of these jurors does not seem to be in any way different from the treatment of B.R.

Finally, the empanelled jury consisted of five Hispanic jurors and one African-American juror. That the jury comprised a significant number of Hispanics leads to the inference the prosecutor's challenge to B.R. was not discriminatory in nature. (*People v. Garcia*, *supra*, 52 Cal.4th at pp. 747-748, rehg. den. Oct. 12, 2011, cert. den. *sub. nom. Garcia v. California* (2012) 132 S.Ct. 2711; *People v. Ward*, *supra*, 36 Cal.4th at p. 203; *People v. Turner* (1994) 8 Cal.4th 137, 168, overruled on other grounds as stated by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5, disapproved on other grounds in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32; *People v. Snow* (1987) 44 Cal.3d 216, 225; see *People v. Johnson*, *supra*, 47 Cal.3d at p. 1221, fn. 7.)

### 3.    *The filing of reasons under seal did not prejudice defendants*

Relying on *People v. Ayala* (2000) 24 Cal.4th 243 and *U.S. v. Thompson* (9th Cir. 1987) 827 F.2d 1254, defendants contend the trial court erred by allowing the prosecutor to file his reasons for striking certain jurors under seal.  Allowing this procedure, defendants argue, constitutes a violation of state law, ethical rules, and a denial of the rights to be present at the hearing, to be assisted by counsel, to an adversarial process, and to due process of law.  While we might agree with defendants' position had an ex parte proceeding actually been held, the manner in which the declaration was filed in this case establishes none of these rights were violated.

As we stated previously, the trial court made its ruling that no prima facie case of discrimination was demonstrated when the motion was initially made on June 21.  The prosecutor at that time did not state his reasons for excluding the challenged jurors. Rather, the prosecutor requested he place his reasons in writing, under seal, ostensibly for purposes of appellate review.[13]  The prosecutor filed his sealed declaration on June 22. Because the trial court made its ruling regarding the lack of a prima facie case on June 21, before the prosecutor even filed his reasons, it is impossible for the court to have considered them.  Thus, the premise upon which defendants rely in making their argument is fundamentally flawed.

It is this fact that distinguishes the cases defendants rely upon in making their argument.  In each case cited by defendants there was some sort of ex parte communication relied upon by the trial court in making its decision.  In *People v. Ayala*,

---

[13]We "can understand why a prosecutor might wish to place on the record his or her reasons for striking a particular juror in the event an appellate court does not agree with the trial court's assessment on the prima facie case issue.  The procedure utilized in this case, however …, does little to protect the prosecutor.  First, the prosecutor's reasons were presented ex parte where defense counsel had no opportunity to offer a response.  Second, the trial court made no comment to indicate whether it would have accepted the explanation if one was required.  These factors should be considered by prosecutors in deciding whether they wish to include an explanation on the record after the trial court has ruled that no explanation is required." (*People v. Christopher* (1991) 1 Cal.App.4th 666, 670, fn. 2.)

the defense made three separate *Wheeler* motions. (*People v. Ayala*, *supra*, 24 Cal.4th at pp. 259-260.) When asked to give reasons for his challenges, the prosecutor declared he did not want to reveal his trial strategy. The court then determined it would hold an ex parte hearing to hear the prosecutor's reasons. (*Id*. at p. 260.) Our Supreme Court held it was an abuse of discretion to hold such a hearing as no actual trial strategy was revealed. (*Id*. at p. 262.) The court further found that using an ex parte procedure to rule on a *Wheeler* motion was also error as it does not allow the defense an opportunity to present facts and legal argument, often leading to an incomplete record. (*People v. Ayala*, *supra*, at pp. 262-264.) However, the court ultimately concluded any error was not prejudicial because it was clear the jurors were excluded for race-neutral reasons.[14]

Likewise, in *U.S. v. Thompson*, after finding a prima facie case of discrimination pursuant to *Batson*, the trial court allowed the prosecutor to state in an ex parte hearing her reasons for excusing the challenged jurors. (*U.S. v. Thompson*, *supra*, 827 F.2d at p. 1257.) The Ninth Circuit Court of Appeals held this procedure was error as it infringed upon the defendant's right to an adversarial proceeding. (*Id*. at pp. 1258-1261.) By excluding the defendant and his counsel from the hearing, the defense had no opportunity to challenge the prosecutor's stated reasons for factual inaccuracies, to articulate legal inaccuracies, or to develop a complete record for review. (*Ibid*.; *Ayala v. Wong* (2013) 730 F.3d 831, 861-862.) The trial court in *U.S. v. Alcantar* (9th Cir. 1987) 832 F.2d 1175 also held an ex parte hearing where the prosecutor stated his reasons for his challenges in a second prong *Batson* review. On appeal after remand, the court in *U.S. v. Alcantar* (9th Cir. 1990) 897 F.2d 436 found the passage of time (two years) made it impossible for the

---

[14]Defendants urge this court not to engage in the prejudice analysis used in *Ayala*, arguing the trial court's receipt of an ex parte communication entitles them to relief. We need not address this argument as it is clear the trial court's ruling was made before the sealed declaration was filed. Likewise, we dismiss defendants' argument that the mere filing of a sealed declaration violated ethical rules. Neither the court nor the prosecutor engaged in an ex parte communication. A declaration of reasons was simply placed under seal with the trial court's permission. There is no evidence these reasons were ever actually communicated to the court or formed any basis of the ruling.

defense to adequately challenge the reasons given by the prosecutor at the original ex parte hearing.

The situation sought to be remedied in each of the above cases simply was not present here. This was not a situation where (1) a prima facie case was found, (2) the prosecutor actually gave reasons for the challenges directly to the court, (3) the court actually considered those reasons under a third prong *Batson* analysis, and (4) the defense was denied an opportunity to evaluate and possibly rebut the reasons or make a full factual record. Rather, the trial court found no prima facie case of discrimination on the record in open court and in the presence of all parties. The trial court's ruling regarding the failure to state a prima facie case of discrimination was necessarily based upon the showing made in open court with all counsel and parties present. The subsequent filing of the prosecutor's reasons, under seal and after the ruling had been made, could not have altered the trial court's ruling in any way. Defendants were never denied any opportunity to rebut any reasons given because the reasons were never considered.

Equally unavailing is the argument, presented for the first time in the reply brief, that the procedure violated defendants' rights because the trial court had the power to reconsider its ruling. Defendants cite *People v. Castello* (1998) 65 Cal.App.4th 1242, 1246, which held a trial court was not precluded from reconsidering a ruling that a prior out-of-state conviction qualified as a serious or violent felony under California law. Defendants also rely upon *Jackson v. Superior Court* (2010) 189 Cal.App.4th 1051 for a similar proposition. While these cases do stand for the proposition the trial court retains jurisdiction and the power to reconsider its ruling, neither case advances defendants' argument. Each case dealt with a trial court's actual reconsideration of its ruling. Here, there is no evidence the trial court ever reconsidered its ruling that defendants failed to meet their burden to establish a prima facie case of discrimination. Indeed, nowhere in their briefs do defendants even make such an assertion. We therefore reject defendants' claim the mere filing of the sealed declaration, after the trial court's ruling, constituted reversible error.

## IV. Discovery Claims

Defendants assert the prosecution violated their statutory discovery rights by failing to disclose instances of cooperation between the Varrio Bakers and the South Side Bakers. Defendants' argument is twofold. Initially, they claim a portion of Littlefield's testimony implied the officer had received information the two gangs cooperated in violent crimes together. Second, they claim, the officer's statement that he had discovered three to four other instances of cooperation between the gangs, other than the ones testified to, violated the discovery order and was prejudicial to the defense. Neither contention is supported.

### A. Pretrial Hearing and Rulings

On August 10, 2010, the trial court ordered the prosecution to provide the defense with any "writings" relating to a claim the Varrio Bakers and South Side Bakers would cooperate or work together to commit a nonviolent crime or a homicide. At the preliminary hearing, Littlefield testified regarding three instances of cooperation between the gangs, two involving drug sales between members of the gangs and one involving a member of the Varrio Bakers who lived within the South Side Baker territory.

Prior to trial, extensive in limine motions were held. On June 24, 2011, while discussing the gang expert's testimony and exhibits that were going to be offered in conjunction with the testimony, Littlefield testified to the substance of a total of seven reports of cooperation between the Varrio Bakers and the South Side Bakers. The first three were the same he had testified to at the preliminary hearing. The last four reports involved similar conduct between the gangs, however, according to the defense, had not been provided. Specifically, Littlefield testified these reports involved an instance of vandalism by a Varrio Baker that "was indicative of the South Side Bakers," an additional instance of joint narcotics sales between the gangs, and discussion with a gang member about animosity between the gangs.

The prosecutor noted the report relating to the vandalism had been provided, and counsel subsequently indicated that was correct. The prosecutor acknowledged the

remaining reports had not been provided. Defense counsel lodged a discovery objection as to these three instances and sought to exclude any reference to them. The court ruled those instances would not be admissible unless there was some prior ruling by the court. The prosecutor agreed he would not use them since the discovery had not been provided, and he removed them from any presentations for the jury.

###### B.    Trial Testimony

At trial, Littlefield testified as a gang expert. The prosecutor, in compliance with the in limine rulings, did not mention the instances of cooperation between the gangs that had been excluded. In fact, the prosecutor did not elicit details of any of the prior instances of cooperation between the gangs during his direct examination. During cross-examination, Salas's attorney elicited the three instances of cooperation which Littlefield had testified to at the preliminary hearing. In addition, defense counsel repeatedly emphasized the sum total of Littlefield's investigation regarding the cooperation between the gangs was limited to these three instances.

Subsequently, in a somewhat confusing line of questioning, Salas's attorney asked Littlefield if he had asked him questions at the preliminary hearing, including whether he had investigated "the possibility that the Varrio Bakers and the South Side Bakers would not cooperate in connection with the commission of a homicide." Littlefield agreed he had been asked such a question and he had responded that he "did not specifically ask anyone if they would not be allowed to cooperate." Salas's attorney also questioned Littlefield regarding whether he had previously testified as to specific instances of cooperation between the gangs and emphasized the cooperation was limited to drug sales.

Casica's attorney brought up a similar issue, asking about the prior instances of cooperation between the gangs, and highlighting they involved drug sales, not crimes of violence, such as robbery or homicide. Littlefield agreed. Then the following exchange took place:

> "[CASICA'S COUNSEL]: I believe [Salas's attorney] had asked you whether or not you conducted any research with regard to whether a Varrio

47.

and a South Side would be allowed to cooperate in a homicide. Recall that?

"[LITTLEFIELD]: I believe he asked me if I asked anybody if they would be allowed to cooperate.

"[CASICA'S COUNSEL]: Right. [¶] And your answer was no?

"[LITTLEFIELD]: That I didn't specifically ask if they were allowed to cooperate.

"[CASICA'S COUNSEL]: Okay. So you've never asked anybody— you've never asked a Varrio member whether or not they would be allowed to cooperate with a South Side to commit a homicide.

"[LITTLEFIELD]: That's not correct, sir.

"[CASICA'S COUNSEL]: You have?

"[LITTLEFIELD]: The question he asked me is if I asked specifically if they would not be allowed to. I have asked the specific question of several Varrio Baker members involving this case individually after picking up the expert testimony for it."

At this point counsel for Salas objected on discovery ground and a sidebar conference was held. Defendants moved for a mistrial, claiming the officer's statement violated discovery, and further asked the court to admonish the jury there was no evidence the two gangs were permitted to cooperate in the commission of a homicide. The prosecutor explained he had provided all of the information on the matter that he had, and he argued a mistrial was an inappropriate remedy at the time. The court denied the motion for mistrial without prejudice, noting Littlefield's response to the question appeared "innocuous." However, the court stated it would hold an Evidence Code section 402 hearing to allow counsel to inquire of the officer further to determine what, if any, information the officer possessed that had not been disclosed. Prior to that hearing, the court excused the jurors for lunch and admonished them they were "not to give any weight or regard whatsoever to the last question and answer. Don't let it affect your verdict in this matter. Give it no weight or regard."

48.

During the hearing, the court asked the officer what he had asked other gang members and who those people were. Littlefield testified he spoke to Frankie Baltierra, asking him if he had heard about the murder generally, but did not recall specifically asking if the gangs were allowed or not allowed to cooperate with each other. At this point, counsel for Salas requested the officer be appointed an attorney, claiming the officer had committed perjury. The court stated it had "sensed an ambiguity in the response given by the officer" and the court "didn't understand the meaning of what [the officer] said that drew the objection." Thus, the court had the officer clarify, stating it "sounds to me like, when I heard it, maybe you have asked members of Varrio Bakers if they're allowed to cooperate with other gang members in homicide cases. Have you?" Littlefield responded, "I asked them specifically about this case and I have asked them about alliances." When questioned if he had specifically asked gang members about committing homicides, Littlefield replied, "I don't believe I've ever asked that specific question." Littlefield further explained he had asked about "alliances for crimes in general. I don't think I narrowed—tried to narrow them down to whether they would be allowed to steal cars together or commit murders or anything in particular."

The court turned the questioning over to Casica's attorney, who argued the officer had given inconsistent answers. When asked if he would like to comment on that, the following exchange took place:

> "[LITTLEFIELD]: In the context of the questions I misunderstood what he was asking me because I was asked if I was—if I ever asked the specific question if they were forbidden or not allowed to—

> "THE COURT: Cooperate in general?

> "[LITTLEFIELD]: If I asked the specific question if they were not allowed to cooperate in general and I must have misunderstood his question about specifically a homicide ….

> "THE COURT: So what would your response be if it's specifically directed to a homicide?

> "[LITTLEFIELD]: To a homicide, no, I've never specifically asked if they're forbidden or allowed to commit a homicide together."

Counsel for Salas was also given an opportunity to question Littlefield in the hearing. Littlefield explained he had never asked gang members specifically about cooperation in a homicide, although he had spoken to gang members about alliances and rivalries. Counsel again moved for a mistrial, claiming the officer "perjured himself" because he stated he had not specifically asked about cooperation among the gangs, which conflicted with his initial objected-to response. He further argued there was a discovery violation and asked the court to dismiss the gang allegations, declare a mistrial, and advise the jury to view the officer's testimony with distrust.

When given a chance to respond, the prosecutor noted the "way the questions have been phrased have been selective and misquoted." He argued the request to appoint Littlefield counsel was "ludicrous in that if you're going to have a witness subject to perjury for every time they make a misstatement on the stand, every witness would be required to have an attorney." The prosecutor summarized Littlefield's testimony as explaining he had prior contact with certain gang members speaking about alliances and rivalries in general, and the officer spoke to one gang member about the case generally, but received no information other than the gang member heard about the murder. The prosecutor argued there were no grounds for a mistrial, and explained a dismissal of any charges would be an inappropriate sanction for a discovery violation as that is a last resort and was not warranted. Further, he noted the court had already given a timely admonishment to the jury to disregard the question and answer, which was sufficient. After a break, defense counsel requested the trial court provide an additional admonishment that Littlefield had given an erroneous answer to the question. After hearing argument from the parties, the court ruled as follows:

> "First of all, I'm going to deny the motion for mistrial. I don't feel … each gentlemen's right to a fair trial has in any way been compromised by what took place this morning.

> "In regard to a request to dismiss gang charges, gang enhancements and allegations, special circumstance, that that would be inappropriate for the same reason. I don't feel that there has been a breach of any in limine ruling, any denial of discovery—or any discovery violation, I should say;

50.

that based on a review of the questions that were asked and answers given, I don't feel, again, either defendant's right to a fair trial has in any way been compromised.

"I don't feel that given the contemporaneous admonition to the jury to disregard the question and answer that there has been any infringement on the defendants' respective rights to a fair trial or any prejudice to either defendant from the proceedings that took place."

In addition, the court explained it would give the jury an additional admonition and instructed the jury as follows:

"Now, this morning, ladies and gentlemen, in a brief hearing outside of your presence Officer Littlefield testified that he had misunderstood the question that drew the objection and he stated that he never asked any Varrio Bakers member whether Varrio Bakers would be allowed to, permitted, or prohibited from cooperating with South Side Bakers in the commission of a homicide. You are to entirely disregard Officer Littlefield's answer and the preceding questions on that subject."

During recross-examination, Salas's attorney asked Littlefield again about the three instances of cooperation between the gangs and again went into the detail of those contacts. On redirect examination, the prosecutor asked Littlefield if he had become aware of three or four additional instances of cooperation between the two gangs since the preliminary hearing. Littlefield indicated he had, not including the violent crimes between the gangs. Defense counsel objected on discovery grounds. Additional recross-examination by counsel for Salas clarified these other instances were of the same variety as the officer previously testified to and briefly went into a fourth incident involving vandalism.

After the prosecution rested its case-in-chief, defendants placed their additional discovery objection on the record. Counsel stated he objected on discovery grounds to the testimony that Littlefield was aware of additional instances of cooperation between the two gangs. He claimed the question violated the prior in limine ruling excluding the additional instances of cooperation, violated discovery, hindered his ability to cross-examine the witness, and that it was "irreparably prejudicial." Once again defendants moved for a mistrial, or a dismissal of the gang enhancements, charges, and special

51.

circumstances. The prosecutor explained that during the questioning, defense counsel "created an artificial limit on the testimony" by saying the officer only reviewed three instances of cooperation, knowing there were additional instances, as he had previously moved to exclude them. To rebut this, the prosecutor simply asked if there were additional instances, without going into detail of any of them, to rehabilitate the expert's credibility. The court denied the motion for the mistrial, noting defendants' right to a fair trial had not been "in any way compromised or prejudiced by the question asked the officer or his response. The response I think was brought on by the question and invited it."

### C.  Legal Principles

Discovery in criminal cases is governed by section 1054 et seq. Section 1054.1 mandates a prosecutor to provide certain information in a criminal case, including all "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case …." (§ 1054.1, subd. (f).) "There is no general constitutional right to discovery in a criminal case." (*Weatherford v. Bursey* (1977) 429 U.S. 545, 559.) However, due process requires the prosecution to disclose favorable, material evidence to the accused. (*Brady v. Maryland* (1963) 373 U.S. 83, 87.)

A trial court's ruling on discovery matters is reviewed for an abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) On appeal, a prosecutor's violation of the reciprocal discovery statute is subject "to the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, and thus is a basis for reversal only where it is reasonably probable, by state-law standards, that the omission affected the trial result." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Defendants argue the prosecution violated statutory discovery requirements by failing to disclose additional instances of cooperation between the gangs. Such a

violation, they contend, prejudiced them by: (1) limiting their ability to cross-examine the expert; and (2) "by implying at trial that the two gangs cooperated in homicides or other crimes of violence," leading the jury to believe the expert "knew something even if the court didn't let him say it." We will discuss each contention in turn.

### 1. *Limited ability to cross-examine the expert*

Defendants contend their ability to cross-examine Littlefield in this case was compromised by the prosecution's failure to disclose the four additional instances of cooperation that were revealed at the in limine hearing. While it appears from the record the reports of these instances had not been provided to the defense in advance of trial, it is likewise clear Littlefield did recount the substance of these instances during the in limine hearing. Thus, the defense did have some information relating to these instances. Because the prosecutor failed to provide the reports of these instances, which were in substance similar to the other instances of cooperation already provided, the court ordered these instances would be inadmissible at trial. This was an adequate remedy for the failure to provide the information.

Defendants do not quarrel with the exclusion of these additional instances, rather, they argue, the prosecutor's reference to them on redirect examination constituted a discovery violation. Specifically, defendants object to Littlefield's testimony that since the preliminary hearing, he had located three to four other instances of members of the two gangs committing crimes together. Assuming this testimony constituted a discovery violation or a violation of the court's in limine ruling, any error was necessarily harmless.

Littlefield had previously testified to three specific instances of cooperation between the gangs that were provided to the defense well in advance of trial. Littlefield's testimony that he was aware of three to four additional instances of cooperation added little if anything to his overall testimony. As the substance of the other instances was never relayed to the jury, it is difficult to see how defendants suffered any prejudice. Further, it is clear defense counsel was aware of these additional instances of cooperation

between the gangs prior to trial, as Littlefield testified to them at the in limine hearing three weeks prior to his trial testimony.

Defense counsel for Salas immediately pointed out on recross-examination that these additional instances of cooperation in criminal activity did not involve violent crime, but rather nonviolent conduct, such as vandalism.  Further, we note defense counsel makes no attempt to demonstrate how this testimony in any way prejudiced the defense.  Defendants simply argue Littlefield "testified about his 'new discoveries' at trial" and "[h]is testimony went to the crux of [defendants'] defense."  But defendants fail to explain what "new discoveries" were testified to at trial or how this information prejudiced the defense.  Thus, we cannot find any prejudice.  (See *People v. Verdugo* (2010) 50 Cal.4th 263, 281-282.)

To the extent defendants argue their right to cross-examine the witness was infringed by any lack of discovery, we find the claim without merit.  In *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 52, a plurality of the Supreme Court noted the "right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination."  The court, in declining to transform the confrontation clause into a discovery tool, explained the "ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony."  (*Id*. at p. 53.)

Rather, the court determined such claims had been traditionally decided under the framework of the due process clause.  (*Pennsylvania v. Ritchie*, *supra*, 480 U.S. at p. 56; cf. *People v. Clark* (2011) 52 Cal.4th 856, 982-983 ["invocation of the confrontation or compulsory process clauses in a claim involving pretrial discovery 'is on a weak footing' because it is unclear whether or to what extent those constitutional guarantees grant pretrial discovery rights to a defendant"].)  As there is no argument the prosecution failed to disclose any exculpatory evidence, as would be required by *Brady v. Maryland*, the due process clause was not implicated here.  Therefore, defendants' claim fails.

## 2. *There was no implication the gangs cooperated in violent offenses*

In a related argument, defendants contend the exchange between Littlefield and Salas's counsel that led to the stricken answer demonstrates a violation of discovery and was so prejudicial as to require a reversal of the judgment. We disagree.

Initially, we note defendants' arguments are based upon the erroneous premise that the question and answer disclosed some prejudicial information to the jury and demonstrated relevant information was withheld from the defense. A fair reading of the record does not demonstrate any prejudicial information was provided to the jury, or that any relevant information was withheld. Instead, the record supports the trial court's conclusion Littlefield misunderstood the question asked of him, believing he was asked about general instances of cooperation or alliances between the gangs.

This case is unlike the cases to which defendants analogize where improper uncharged misconduct evidence was provided to the jury (*People v. Gibson* (1976) 56 Cal.App.3d 119, 130), or where highly prejudicial and inadmissible statements were admitted during the trial (*Krulewitch v. United States* (1949) 336 U.S. 440, 441-442). Here, the objected-to testimony consisted of a question and an answer that provided no information to the jury as to whether the gangs were specifically allowed to cooperate with each other in violent crimes. Defendants contend the officer insinuated the two gangs had cooperated in violent crimes together. Not so. The question and answer at issue at most insinuated the officer had *asked* gang members whether the two gangs could cooperate together in the commission of a homicide. The testimony did not indicate whether he had gotten a response or what the response was. To the extent one could argue the jury was left to wonder what the answer to the officer's question was or why the jury was not informed of the answer, we note not only was the jury immediately instructed to disregard the question and answer, but was further instructed the officer had actually misunderstood the question posed by defense counsel and he had not in fact asked gang members if the two gangs could cooperate in a homicide. In light of these admonitions, it is clear there could be no prejudice to the defense as no information was

55.

given, and the jury was affirmatively instructed the officer had misunderstood the question and never asked if the gangs could cooperate in violent crimes together.

We also reject defendants' assertion the jury could not properly follow the court's admonition. As the Supreme Court has stated:

> "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, [citation], and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant, [citation]." (*Greer v. Miller* (1987) 483 U.S. 756, 766, fn. 8.)

Nothing in the exchange leads to the conclusion the jury could not follow the instruction that the officer simply misunderstood the question and had never asked the question the defense argued was implied. Thus, defendants could not have been prejudiced by the exchange.

Likewise, we reject defendants' argument the exchange demonstrated information was withheld. During the hearing out of the jury's presence, the officer testified he had not asked any gang members whether they were allowed to or prohibited from cooperating in a homicide together, and he had misunderstood that the question related specifically to cooperation regarding homicides. While he did testify he had asked gang members regarding cooperation in general, he had not received any information. It appears all relevant information had previously been disclosed. As a result, defendants' claim fails.

## V.     Admission of Gang Exhibits

Defendants contend the admission of six photographs depicting gang graffiti, gang tattoos on gang members, and gang members displaying a gang sign constituted impermissible character evidence and was unduly prejudicial requiring reversal of the judgment. Defendants' argument lacks merit.

Evidence Code section 351 provides "all relevant evidence is admissible" unless it is otherwise prohibited. Evidence Code section 1101, subdivision (a) provides "evidence of a person's character … is inadmissible when offered to prove his or her conduct on a

specified occasion." However, this restriction does not preclude "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact … other than his or her disposition to commit such an act." (*Id.*, subd. (b).)

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Evidence is relevant if it tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'" (*People v. Williams* (2008) 43 Cal.4th 584, 633-634.) A trial court enjoys broad discretion in determining the relevancy of evidence. (*People v. Cash* (2002) 28 Cal.4th 703, 727.) We review a trial court's rulings on relevance and the admissibility of evidence for abuse of discretion. (*People v. Aguilar* (2010) 181 Cal.App.4th 966, 973.)

## A. Procedural History

Prior to trial, defense counsel objected to PowerPoint slides prepared by Officer Littlefield that the prosecution sought to use in conjunction with the expert testimony regarding criminal street gangs. The trial court held an evidentiary hearing where Littlefield testified regarding the slides. At the hearing, defense counsel objected to virtually every slide in the presentation. After extensive discussion and a tentative ruling by the trial court that some of the slides would be inadmissible, the prosecutor agreed to provide defense counsel with a revised packet of slides. The court indicated it would address the issue again prior to Littlefield's testimony.

During trial, before Officer Littlefield testified, the court held another hearing on the issue of the PowerPoint slides related to the issue of gangs. At that hearing, counsel for Salas stated he had been provided with the new presentation offered by the prosecution. Counsel objected to several slides from the revised packet, which he assembled and provided to the court for a ruling on their admissibility. The court reviewed each slide, with the defense stating its objection to each slide, and the prosecutor stating his theory of admissibility. Counsel for Casica joined in all objections made by Salas.

Six slides now challenged on appeal were admitted over defense objection.[15] They are as follows:

- Court exhibit 24/People's exhibit 166 depicted the back of a man's shaved head with a tattoo of a kanpol on the neck along with other unrelated tattoos.

- Court exhibit 25/People's exhibit 168 depicted the garage door of a house covered with graffiti and the words "Varrio Bakers KC" as well as the monikers "Sicko" and "Stranger."[16]  The letters "n" and "o" are crossed out throughout the graffiti and a kanpol is displayed in the upper corner of the garage.

- Court exhibit 27/People's exhibit 170 depicted the back of a man's shaved head with BKS and Sur tattooed in large letters.

- Court exhibit 28/People's exhibit 175 depicted a portion of a man's face with the word "Southgate" tattooed above the upper lip, SSBKS below the lower lip, and SSBKS across his neck.

- Court exhibit 29/People's exhibit 178 depicted graffiti from the South Side Bakers gang.  It has "South Gate Lokos," SSLL and SSBKS written on the side of a house.  Similar to court exhibit 25, all letters "o" are crossed out, symbolizing a rivalry with the Okie Bakers.

---

[15]Defendants attempt to challenge two additional slides, People's exhibits 176 and 177. Neither counsel objected to these slides when presented as part of the revised packet or at trial. While counsel did object to them in the preliminary discussion of the entire packet, it was clear from the discussion between the court and counsel that further objections would need to be made to the revised packet once it was provided.  Because no final ruling had been given on any of the slides at that point, further objections were required. (See *People v. Holloway* (2004) 33 Cal.4th 96, 133 [tentative pretrial evidentiary ruling, made without fully knowing what trial evidence would show, will not preserve issue for appeal if appellant could have, but did not, renew objection or offer of proof and press for final ruling in the changed context of trial evidence itself].)  At the initial hearing, counsel for Casica conceded the prosecutor "makes a case as to that particular tattoo" regarding what was ultimately admitted as People's exhibit 177.  The failure to raise any objection to the slides at the subsequent hearing or at trial forfeited the issue on appeal.

[16]It appears the word is spelled "stanger" in the graffiti.

- Lastly, court exhibit 32/People's exhibit 180 depicted three men under a Southgate street sign. One man is making the letter "S" with his hands, which is a symbol for South Side, while another is wearing a blue Dallas Cowboys jersey, the color adopted by the Sureño organization.

## B. The Exhibits Were Relevant

Defendants' contention the six photographs were not relevant to prove any fact in issue, and thus constituted improper character evidence, is not well taken. Defendants were both charged with the gang participation offense as well as a gang enhancement. Although defendants' convictions on the gang participation offense must be reversed for insufficient evidence, their convictions for the gang enhancement stands. As such, their gang membership was obviously relevant to the charges.

Defendants seem to argue that because they stipulated their gangs qualified as criminal street gangs under the statute, the contested evidence was irrelevant. Not so. The stipulations were quite limited, providing only that the Varrio Bakers and South Side Bakers were criminal street gangs within the meaning of the statue. These stipulations were insufficient to remove the issues of defendants' gang membership and the gangs' conduct in general from the jury.

First, the evidence established Casica claimed membership in the Southgate Lokos as well as the South Side Bakers. Thus, the prosecution needed to establish the connection between the Southgate Lokos gang and the South Side Bakers gang. Littlefield testified the Southgate Lokos was a subset of the South Side Bakers. To support this testimony, he provided People's exhibit 175 showing a man with tattoos depicting South Side Bakers and "Southgate," demonstrating the relationship between the gangs. Likewise, People's exhibit 178 had the words "South Gate Lokos," "SSLL," and "SSBKS," demonstrating the South Side Bakers acknowledged the Southgate Lokos as a subset. Similarly, People's exhibit 180 of three men under a Southgate street sign while one made the hand signal for South Side and another is wearing a blue jersey tended to show Southgate Lokos was a subset of the South Side Bakers. The connection between

59.

the two was necessary to show that by being a member of the Southgate Lokos, Casica was also a member of the South Side Bakers.

Second, the stipulation did not encompass all of the elements of the gang enhancement. It was still incumbent upon the prosecution to prove defendants committed the crimes for "the benefit of, at the direction of, or in association with any criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).) Because defendants were members of different gangs, the prosecution presented evidence the two gangs were both subsets of the larger Sureño organization and the two gangs shared common symbols, colors, ideologies, and rivals. This evidence was relevant to show why defendants, as members of two separate gangs, would cooperate in committing the charged offenses.

This was shown through People's exhibit 170, a photograph of the back of a man's shaved head with both a BKS and a Sur tattoo. Testimony established "BKS" stands for "Bakers" a common tattoo that both defendants in this case share. "Sur" relates to the Sureño organization or ideology. Further, People's exhibits 168 and 178, photographs depicting graffiti from each gang, showed the gangs have common rivals. In both pictures, the letter "O" is crossed out. Littlefield testified this was a means of showing disrespect for the Okie Bakers, a rival to both the Varrio Bakers and South Side Bakers. Thus, the graffiti demonstrated defendants' gangs shared a common rival. In addition, both exhibits demonstrated the gangs' allegiance to the Sureño organization, as both had symbols relating to the number 13. Likewise, exhibit 166 showing the back of a gang member's head with a kanpol tattoo showed the significance of the symbol in the gang context. Evidence that both the Varrio Bakers and South Side Bakers used the symbol tends to show some sense of alliance between the gangs. This was of course relevant as it tended to show the two gangs could cooperate with each other.

That the evidence is relevant is highlighted by the fact defendants brought out evidence of a rivalry between the two gangs, arguing their members could not jointly engage in criminal acts together on behalf of the gang. Evidence relating to the fact both

60.

gangs were subsets of the Sureño organization and both gangs used the kanpol symbol as demonstrated in tattoos, graffiti, and even some of Casica's own writing, all tended to show the two gangs shared some common ideology. Further, the graffiti demonstrated the Varrio Bakers and South Side Bakers had common rivals, further supporting the inference the gangs were aligned. The evidence, therefore, was relevant to an issue at trial.

The contested evidence was also probative of the relationship between the Southgate Lokos and South Side Bakers as well as between the Varrio Bakers and South Side Bakers. This relationship was relevant to whether Salas and Casica acted to benefit their own or each other's gang in the commission of the crimes, an issue that was hotly contested at trial. The evidence was further relevant to rebut defense claims that the two gangs were rivals and could not have committed crimes together for their gangs. As such, the trial court's ruling admitting the evidence as relevant did not constitute an abuse of discretion.

## C.    Evidence Was Not Unduly Prejudicial

Defendants further argue the evidence was cumulative and unduly prejudicial and should have been excluded pursuant to Evidence Code section 352. This contention also fails. A court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice." (*Ibid.*)

> "Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. 'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome [citation]."' [Citation.] On appeal, we review the trial court's rulings concerning the admissibility of the evidence for abuse of discretion. [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 290.)

Defendants failed to establish admission of the photographs was an abuse of discretion. There was nothing arbitrary, capricious, or patently absurd about the trial

61.

court's ruling. The photographs were relevant to an issue in the trial. Further, there was nothing inflammatory or prejudicial about the evidence. The prejudice the statute seeks to avoid is not the damage to a defense that naturally flows from highly probative evidence. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." (*People v. Farmer* (1989) 47 Cal.3d 888, 912, overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

Citing *People v. Albarran*, *supra*, 149 Cal.App.4th 214, defendants argue the gang evidence was unduly prejudicial. In that case, the trial court allowed substantial gang evidence, believing it was relevant on the issue of motive and intent as to the underlying charges and to the charged gang enhancement. After the jury returned a guilty verdict and found the gang allegation true, the defendant moved for a new trial. He alleged the evidence was insufficient to support the jury finding on the gang allegation and that, absent the allegation, the gang evidence was irrelevant and prejudicial. The court granted the new trial motion as to the gang enhancement, but denied it as to the underlying charges. (*Id.* at p. 222.)

The *Albarran* court concluded the gang evidence was irrelevant to the underlying charges. On the issue of motive, although the gang expert testified the shooting took place at a gang member's home, he was unaware of any rivalries between the host's gang and any others. Thus, the expert's conclusion the shooting was carried out to enhance the respect of the defendant's gang had no foundation. (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 227.) The court went on to state that even if it "were to conclude that evidence of Albarran's gang membership and some evidence concerning gang behavior were relevant to the issue of motive and intent, other extremely inflammatory gang evidence was admitted, which had no connection to these crimes." (*Ibid.*) The court referred to evidence of a specific threat to kill police officers that other members of Albarran's gang made in their graffiti, descriptions of other crimes committed by various members of his gang, and testimony relating to the Mexican Mafia. It determined none

of this evidence was relevant to the underlying charges against Albarran and undermined his right to a fair trial. It ordered a new trial. (*Id.* at p. 232.)

In the present case, the gang enhancement remains. Unlike *People v. Albarran*, the gang evidence was relevant to issues in the trial. Further, unlike *Albarran*, the challenged gang evidence was fairly limited and was not unduly inflammatory. It involved only photographs of tattoos, graffiti, and one picture of men making a gang sign. There was nothing inherently prejudicial about the photographs when the jury was already well apprised both defendants were gang members. Nothing in the challenged evidence showed other gang members acting violently, committing crimes, or threatening police officers as in *People v. Albarran*.

This case is strikingly similar to *People v. Valdez* (2012) 55 Cal.4th 82. There, Valdez and his codefendant were convicted of the murders of five victims, and allegations they were acting on behalf of a street gang were found true. Both men were sentenced to death. On appeal, Valdez argued photographic evidence of his and his codefendant's tattoos, photographs of gang graffiti, and photographs of other gang members—"some of whom were brandishing weapons or 'throwing' gang signs"—was unduly prejudicial. (*Id*. at p. 128.) In rejecting the argument, our Supreme Court first noted prejudice "'for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.'" (*People v. Valdez, supra*, at p. 133.) The court explained the evidence was relevant to disputed issues, despite the defense's proposed stipulation the defendant was a gang member, and likewise rejected the argument the evidence was inadmissible because the prosecution could have proved the disputed matters with other evidence. (*Id*. at p. 134.) Moreover, the photographs were admissible even if repetitive of other evidence as long as the probative value was not outweighed by the prejudicial effect. (*Ibid*.)

In assessing the prejudicial effect of the evidence, the court explained,

"[T]he prosecution introduced a raft of other gang-related evidence—mostly in the form of testimony—that defendant neither objected to at trial nor challenges on appeal. Given the extensive other evidence of defendant's Sangra gang membership and of Sangra's activities, defendant's claim that the handful of gang-related exhibits he now challenges created 'a substantial danger of undue prejudice' within the meaning of Evidence Code section 352—i.e., the challenged evidence '"*uniquely* tend[ed] to evoke an emotional bias against defendant as an individual"' (*People v. Bolin* (1998) 18 Cal.4th 297, 320, italics added)—is untenable." (*People v. Valdez*, *supra*, 55 Cal.4th at p. 134.)

Similarly here, defendants' claim of prejudice fails on the record. A significant amount of other gang evidence was produced during the trial, none of which is challenged on appeal. The challenged evidence simply denoted tattoos of other gang members, some graffiti, and three gang members standing under a street sign while one man made a hand signal for the gang. There is nothing inherently prejudicial about the photographs, especially in light of the other evidence presented in the context of the case. Thus, the evidence cannot be viewed as unduly prejudicial.

### D.    Admission of Exhibits Was Not a Violation of Due Process

For the same reason, defendants' due process argument fails.

"To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is … whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran*, *supra*, 149 Cal.App.4th at pp. 229-230.)

No such showing is made here. The evidence was relevant and not unduly prejudicial, thus, the trial court did not abuse its discretion in admitting it. Defendants' due process rights were not violated.

## VI. The Section 1202.45 Parole Revocation Fine Must Be Stricken

Defendants contend, and plaintiff rightly concedes, the abstract of judgment must be amended to delete a reference to a section 1202.45 parole revocation fine of $200.

At the time of sentencing, former section 1202.45 provided:

"In every case where a person is convicted of a crime and whose sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. This additional parole revocation restitution fine shall … be suspended unless the person's parole is revoked."

At the sentencing hearing the trial court imposed a section 1202.4 restitution fine of $200 as to each defendant. The court also imposed a corresponding $200 parole revocation fine pursuant to section 1202.45 as to each defendant. These fines are reflected in each defendant's abstract of judgment.

While a section 1202.45 parole revocation fine is mandatory whenever a section 1202.4 restitution fine is imposed, such a fine is not authorized when the sentence does not encompass a period of parole. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 [parole revocation fine not authorized where defendant sentenced to life without possibility of parole in addition to indeterminate term]; cf. *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine proper where defendant, in addition to being sentenced to death, also sentenced to determinate term].) Defendants were sentenced to life without the possibility of parole, in addition to an indeterminate term of 25 years to life. They were not sentenced to any other determinate term, thus, the fine may not be imposed in this instance. (*People v. Oganesyan*, *supra*, at pp. 1183-1184; *People v. Brasure*, *supra*, at p. 1075.)

## VII. The Abstract of Judgment Does Not Require Correction

Casica argues his abstract of judgment erroneously reflects he was sentenced to 25 years to life for the section 186.22, subdivision (b) gang enhancement. While he correctly points out section 186.22, subdivision (b) does not authorize a sentence of 25

years to life, he misreads the abstract of judgment as imposing a sentence of 25 years to life for that enhancement. At sentencing, the trial court indicated the term of 25 years to life was imposed for the former section 12022.53, subdivisions (d) and (e)(1) enhancements. Further, the court stated the enhancement pursuant to section 186.22, subdivision (b)(1) was stayed.

The abstract accurately reflects this sentence, which indicates a term of 25 years to life for the former section 12022.53, subdivisions (d) and (e)(1) enhancements. The abstract further denotes Casica was convicted of the gang enhancement and then reflects the enhancement was stayed in this case. The stay is indicated by the "S" in the adjacent box labeled "Time Imposed." The notation of "25 to Life" in the box adjacent to the stay reflects the total term for all enhancements imposed in the case, as demonstrated by the label "Total" for that column. Thus, the abstract is not in need of correction.

## DISPOSITION

The judgment of conviction on count 5, the gang participation offense (§ 186.22(a)) is reversed as to both defendants. In addition, the $200 parole revocation fine (§ 1202.45) is ordered stricken as to both defendants. The trial court is ordered to prepare amended abstracts of judgment reflecting these changes and to forward copies of the amended abstracts to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

_____

PEÑA, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

CORNELL, J.

66.